606 F.2d 1131
 196 U.S.App.D.C. 224
 HOUSTON LIGHTING & POWER COMPANY, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Burlington Northern, Inc., Intervenor.
ARIZONA ELECTRIC POWER COOPERATIVE, INC., Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Atchison, Topeka and Santa Fe Ry. Co., et al., Intervenors.
 Nos. 77-2070, 77-2071.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 13, 1978.
Decided June 26, 1979.
Rehearing Denied Aug. 22, 1979.
 
 William L. Slover, with whom C. Michael Loftus, Washington, D. C., was on the brief, for petitioner.
 Kenneth G. Caplan, Deputy Associate Gen. Counsel, I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, I. C. C., Washington, D. C., was on the brief, for respondent.
 
 
 1
 Howard J. Trienens, Chicago, Ill., a member of the bar of Supreme Court of Ill., pro hac vice by special leave of court with whom R. Eden Martin, Richard J. Flynn and Lee A. Monroe, Washington, D. C., were on the brief, for intervenors.
 
 
 2
 John L. Hill, Atty. Gen. of Texas, David M. Kendall, Jr., First Asst. Atty. Gen., P. M. Schenkkan, Sp. Asst. Atty. Gen., and J. David Hughes, Asst. Atty. Gen. of Texas, Austin, Tex., were on the brief, for State of Texas, amicus curiae in support of petitioner.
 
 
 3
 Ellen K. Schall, Atty., I. C. C., Washington, D. C., entered an appearance for respondent I. C. C.
 
 
 4
 Robert Lewis Thompson, Robert B. Nicholson and Edward E. Lawson, Jr., Attys., Dept. of Justice, Washington, D. C., entered appearances for respondent U. S.
 
 
 5
 Before BAZELON, LEVENTHAL and ROBB, Circuit Judges.
 
 
 6
 Opinion for the Court filed by Circuit Judge LEVENTHAL.
 
 LEVENTHAL, Circuit Judge:
 
 7
 These consolidated petitions for review bring before the court for the first time a new provision added to the Interstate Commerce Act by the Railroad Revitalization and Regulatory Reform Act of 1976 (the "Reform Act").[1] That provision, now revised and codified as 49 U.S.C. § 10729, provides for expedited consideration by the Interstate Commerce Commission (ICC or Commission) of any proposed rate filing by a rail carrier that is for new service requiring a total capital investment of $1,000,000 or more. If the Commission does not find the proposed "capital incentive rate" unlawful within 180 days after the filing of a notice of intent to establish such a rate, the rate may not be suspended or set aside for five years after it becomes effective.[2]
 
 
 8
 Petitioners are electric utilities which have committed themselves to the construction of large coal-fired electric generating units and which have entered into supply arrangements with western coal producers. They challenge the ICC's approval of capital incentive rates proposed by railroads for the movement of coal from mines to the generating units.
 
 
 9
 Petitioners have two main claims. First, they challenge the Commission's jurisdiction to consider the proposed rates under § 10729. They contend that the railroads' proposed capital investments are not of the kind contemplated by § 10729, and that, in any event, the Commission's determinations that the $1,000,000 threshold requirement was met lacked evidentiary support. Second, even assuming that § 10729 was properly invoked, they challenge the Commission's findings that the proposed rates were just and reasonable. We affirm.
 
 I. BACKGROUND
 
 10
 The two proceedings under review are similar both in factual background and legal issues presented.
 
 
 11
 Houston Lighting and Power Co. (HL&P), the petitioner in No. 77-2070, provides electricity to a large portion of the Texas Gulf Coast, including the city of Houston. To meet rising demand, HL&P began construction of its W. A. Parrish Station at Smithers Lake, Texas. Responding to the current emphasis on use of domestic coal resources to reduce dependence on foreign petroleum and scarce natural gas supplies, HL&P decided to use coal to fire the two 660,000 kilowatt generating units making up the Parrish Station. When in full operation, the two units will consume nearly five million tons of coal a year. HL&P entered into an agreement for the supply of its long-term coal requirements from a mine near Decker, Montana. Because that mine was not yet productive, HL&P contracted to obtain at least 12.7 million tons of coal from the Jacobs Ranch Mine near Reno, Wyoming.
 
 
 12
 The coal from Wyoming was to move by railroad in unit trains of approximately 100 cars over a 1607 mile route from Cordero, Wyoming, to Smithers Lake. Of the 1607 miles, the major portion, 1308 miles from Cordero to Ft. Worth, Texas, is over the lines of the Burlington Northern (BN) and its affiliates. The remainder, the 299 miles from Ft. Worth to Smithers Lake, is on the lines of the Atchison, Topeka & Santa Fe (Santa Fe). A dispute arose between HL&P and the railroads over the terms under which the coal would be transported. Negotiations for the publication of a tariff applicable to its coal shipments proved unfruitful, and HL&P found it necessary to purchase 1,200 large-capacity coal cars when the carriers indicated their unwillingness to provide such equipment. In May, 1977, HL&P filed a complaint with the ICC requesting that it prescribe just and reasonable rates and regulations for its coal traffic.[3]
 
 
 13
 Pursuant to § 10729 and its implementing regulations,[4] BN and Santa Fe filed shortly thereafter, on June 3, 1977, a notice of intent to establish a "capital incentive rate" applicable to coal traffic from Cordero to Smithers Lake. The notice proposed a rate of $15.60 per net ton, subject to an annual escalation provision, and an alternative rate of $16.54 per net ton subject only to general rate increases approved by the ICC. The rates would apply only to unit-train movements in shipper-supplied cars, and were subject to a minimum annual volume of four million tons. No separate rate for shipment in carrier-supplied cars was proposed.
 
 
 14
 The railroads accompanied their notice of intent with affidavits asserting that the movement of HL&P's coal traffic would require a total capital investment of more than $1,000,000. BN asserted that investments in new locomotives and related equipment necessary to move four million tons of coal annually would exceed $27,000,000, and that improvements in, and increased maintenance of, track structure (roadway) attributable to the coal traffic would substantially exceed $1,000,000. Santa Fe stated that, in addition to investment in tract structure, its investment in locomotives and related equipment would exceed $9,000,000.
 
 
 15
 HL&P filed a protest to the proposed rate schedules, and the case was considered on written submissions.[5] In a November 28, 1977, decision, the Commission found that investment in new locomotives and in upgrading roadway and other plant qualified the proposed rate for treatment under § 10729. It further concluded that the rate of $15.60 per net ton was just and reasonable. However, it rejected the escalation formula to which the $15.60 rate was attached, as well as the proposed $16.54 flat rate.[6]
 
 
 16
 Arizona Electric Power Cooperative (AEPC), the petitioner in No. 77-2071, is a non-profit, rural electric cooperative which engages in the production and wholesale distribution of electricity throughout the state of Arizona. It has commenced construction at its Apache Station near Cochise, Arizona, of two coal-fired electric generating units that will consume one million tons of bituminous coal annually. AEPC secured its long-term coal supplies from mines near Gallup, New Mexico. This coal will move by railroad over a 523 mile route 371 miles via the lines of Santa Fe from Gallup to Deming, New Mexico; and 152 on the lines of the Southern Pacific from Deming to Cochise.
 
 
 17
 As in HL&P's case, negotiations for the publication of a tariff agreeable to both the utility and the carriers proved unavailing. By complaint filed January 19, 1977, AEPC sought prescription by the Commission of the just and reasonable rate for the coal traffic. During the pendency of the complaint proceedings, Santa Fe and Southern Pacific filed a notice of intent to establish a capital incentive rate of $8.64 per net ton for coal traffic from Gallup to Cochise. The proposed rate applied to unit-train shipments in shipper-supplied cars, subject to a minimum of one million tons per year.
 
 
 18
 By accompanying affidavit, Santa Fe asserted that the new coal traffic would require an investment of at least $3,000,000 for new locomotives and $2.41 million for construction and upgrading of track structure. Southern Pacific alleged a required investment exceeding $2,000,000 for new locomotives and related equipment.
 
 
 19
 Over protest by AEPC, the Commission held on November 28, 1977, that the railroads' proposed investment in locomotives and roadway satisfied the requirements for treatment under § 10729, and that the $8.64 rate was just and reasonable.[7]
 
 
 20
 The utilities filed petitions for review. The railroads intervened on behalf of the ICC. The United States, a statutory respondent, takes no position in this controversy.
 
 II. ICC JURISDICTION UNDER § 10729
 
 21
 We first consider petitioners' threshold argument that the Commission erred in its determination that the railroads' claimed investment in locomotives and roadway improvements qualified their proposed rate schedules for consideration under § 10729, and for its five-year preclusion of attack.
 
 A. The Congressional Intent
 
 22
 The issue is whether, as petitioners contend, Congress intended to limit § 10729's special procedures and protections to rates that reflected investment in new or innovative types of rail facilities, equipment or services. In petitioners' view, the section does not extend to rates based on more conventional investments, such as for locomotives and roadway, merely necessitated by new or increased traffic. As originally enacted, the provision could be invoked "whenever the implementation of the proposed schedule would require a total capital investment of $1,000,000 or more."[8] Its 1978 codification, as § 10729, provides that it applies to rates "requiring a total capital investment of at least $1,000,000 to implement."[9] Obviously, the language makes no reference to innovation.
 
 
 23
 What petitioners point to is the section's genesis as a reaction to the difficulties encountered by the Southern Railway in its efforts to publish new, lower rates for the shipment of grain in the large-capacity, aluminum "Big John" cars that it had developed at a cost of $13,000,000.[10] They glean from the legislative history various bits of support.
 
 
 24
 A concern that regulatory obstacles were stifling technical innovations in the railroad industry by discouraging investment clearly informed Congress in its enactment of a capital incentive rate provision. But in enacting the capital incentive rate provision Congress did not limit itself to that concern.
 
 
 25
 Bills addressed to the deteriorating financial condition of the railroad industry were introduced in two successive Congresses. In the 93rd Congress, the Department of Transportation sponsored a Transportation Improvements Act that included a section closely resembling the capital incentive provision ultimately enacted, save that it established a threshold of $500,000.[11] The provision contained no language limiting it to "new" or "innovative" types of service. But Secretary of Transportation Brinegar, testifying on behalf of the bill before a subcommittee of the House Committee on Interstate and Foreign Commerce, implied such a limitation. He explained the purpose of the capital incentive provision:
 
 
 26
 to reduce the delay and uncertainty associated with the introduction of new services, and thereby to encourage experimentation and the introduction of service innovations.[12]
 
 
 27
 The Committee evidently adopted the Secretary's view of the purpose of the capital incentive provision. The bill it reported, the Surface Transportation Act, contained a capital incentive provision applicable to proposed rate schedules "whenever the implementation of the proposed rate schedule Would result in a new type of service for the shipper requiring a total capital investment of $1,000,000 or more."[13] The Committee's report emphasized that the section was to apply where "the service to be offered is genuinely innovative in character."[14] While this bill passed the House, it died in the Senate.
 
 
 28
 The 94th Congress again addressed, and eventually acted upon, the plight of the railroads. In the House, the Department of Transportation sponsored a bill containing a capital incentive provision essentially identical to the one in the Transportation Improvements Act it had proposed to the 93rd Congress.[15] The Department did not propose limiting language but it again asserted that the provision was directed to the problem that "(t)ime, expense, delay and uncertainty associated with the regulatory process have . . . discourage(d) experimentation and the introduction of service innovations."[16] Congressman Adams introduced another bill containing a capital incentive provision identical to the one adopted by the House the preceding session including the express reference to new types of service.[17] The bill ultimately reported by the Committee on Interstate and Foreign Commerce contained a capital incentive provision that followed the language of the provision in the Department of Transportation bill, with no reference to innovative service.[18] This bill provided the essence of the provision enacted into law.
 
 
 29
 At bottom, petitioners argue that because Congress ultimately adopted the Department of Transportation formulation, it embraced the Department's conception limiting the provision as applicable only to new or innovative types of service, despite the absence of express language to that effect. But just such a limitation was reported and approved by the House in the 93rd Congress, and was in the bill introduced by Congressman Adams in the 94th Congress. In this setting we discern that the House made a deliberate choice to give the provision a greater scope than that suggested by the "innovative" limiting language. In contrast to the provision approved by the House in the 93rd Congress, with emphasis on services that were "genuinely innovative in character," the House Committee in the 94th Congress noted "the need for innovation And modernization within the railroad industry."[19] By referring to "modernization," the Committee clearly contemplated that investments for purposes other than innovation would come within the capital incentive provision.
 
 
 30
 The capital incentive provision originally passed by the Senate differed somewhat from the House version that ultimately prevailed.[20] But it contained no limitation to innovative service. Explaining its provision, the Senate Commerce Committee stated that the provision would apply "in all instances where the carrier's plans can be properly verified."[21]
 
 
 31
 To give § 10729 its natural meaning is entirely consistent with, indeed advances, Congress's broad objective in enacting the Reform Act. Responding to the grave financial difficulties encountered in recent years by many of the nation's railroads, and perceiving that regulatory obstacles had contributed to these difficulties,[22] Congress enunciated the purpose
 
 
 32
 to provide the means to rehabilitate and maintain the physical facilities, improve the operations and structure, and restore the financial stability of the railway system of the United States, and to promote the revitalization of such railway system . . . through ratemaking and regulatory reform.[23]
 
 
 33
 The Commission's interpretation of § 10729 is consonant with that purpose, on the basis of encouragement of investment necessary to meet the needs of new traffic such as the massive longhaul coal movements at issue here by assuring expeditious consideration of rates for that traffic and by guaranteeing their stability for a fixed period.
 
 
 34
 Petitioners protest that § 10729 cannot apply to types of investment which railroads have historically made in order to fulfill their obligations as common carriers.[24] The mere fact that a railroad has a common carrier obligation for new traffic, assuming that exists here, does not mean that § 10729 is redundant or superfluous. Even where legally obligated, a railroad in financial straits may face difficulty in raising necessary funds unless it has some assurance that it will receive a compensatory rate and that the rate will remain stable. And there is always a zone of discretion as to the timing of plans to carry out an obligation. A provision like § 10729 may spur a carrier to the earlier point in that zone.B. Requirement of a "Nexus"
 
 
 35
 Petitioners make a related argument that § 10729 requires a "nexus" between the proposed investment and the specific traffic to which the new rate will apply. They point to a "nexus" requirement in an ICC opinion accompanying regulations establishing procedures under § 10729,[25] and contend that investments in locomotives and roadway cannot satisfy it. However, the ICC's interpretation of § 10729 does not embody a premise that the section applies only to new or innovative types of service. Its opinion does not say so. Invoking the congressional purposes discussed above, the Commission expressly observed that the capital incentive provision would apply to investment for the purpose of "attracting new traffic" as well as for the purpose of "promoting innovative or improved service."[26] What the Commission did recognize was that "systemwide rate modification predicated upon major investment affecting traffic generally was not contemplated as within the scope" of the capital incentive provision. It is only in this context, of distinguishing a systemwide modification affecting traffic only generally, that the ICC required a "nexus" defined as a "reasonably direct" or "identifiable" effect of the capital investment upon the transportation service to which the proposed rate schedule would apply.[27]
 
 
 36
 That definition and purpose of "nexus" is satisfied in the case at hand. Petitioners argue that even the ICC's approach cannot extend to expenditures for locomotives and related equipment. As for these investments there can be no "nexus" because locomotives are not "dedicated" to specific traffic, but rather are assigned to locomotive pools from which locomotives for all of the carrier's operations are drawn. The Commission rejected any dedication requirement, concluding that investment in locomotives would qualify so long as there is "a showing that the additional locomotive power is needed for the new service." HL&P J.A. at 47; AEPC J.A. at 58. The Commission's decision on this point is reasonable, and consistent with the statute and the Commission's own interpretation. It is reasonable to say that demonstration of a direct causal relationship between large volumes of new traffic and the necessity for additional equipment to move that traffic is sufficient to satisfy a requirement of "identifiable effect."
 
 
 37
 Roadway expenditures, it is argued, lack the requisite nexus because such improvements benefit all traffic moving along the line, not just the specific traffic for which the new rate is proposed. The Commission did recognize in its initial interpretation of the capital incentive section that investments can not ordinarily qualify for capital incentive treatment when their only purpose is to maintain or to restore the condition of lines serving many shippers.[28] In the proceedings now before the court, the Commission concluded that a different situation obtains when it is demonstrated that the roadway upgrading and improvements are necessary to serve safely the increased traffic volume created by unit-train coal shipment. Such investments could qualify even though they would benefit other shippers using the line. HL&P J.A. at 48-49; AEPC J.A. at 59-60. Here, as in the case of locomotive expenditures, we sustain the Commission's conclusion that such a causal relationship between the new traffic and proposed investment satisfies the nexus requirement, and that a "direct" or "identifiable" effect on specific traffic can be found when that traffic requires roadway upgrading. This approach is reasonable and in accordance with the legislature's objective.
 
 
 38
 C. Requirement of "Agreement"
 
 
 39
 Petitioners also argue that agreement between the shipper and the railroad on the proposed rate for the new traffic is a prerequisite to consideration under § 10729. At least for investments made entirely by railroads, there is no basis for this contention. Nothing in the statute suggests such a requirement. Though the Commission has emphasized that for § 10729 to achieve its purpose, railroads, shippers and others "must work closely together to reach mutually beneficial solutions,"[29] its regulations do not prescribe agreement as a prerequisite.[30]
 
 
 40
 D. Evidentiary Support for Commission Findings of Qualification
 
 
 41
 There is plainly requisite evidentiary support for the Commission's determination in each case that the railroads had demonstrated that implementation of the new service would require an investment of $1,000,000 or more. In HL&P's case, the railroads presented evidence that they would have to purchase 69 new locomotives and an additional number of cabooses because of the new service. HL&P does not dispute the need for locomotive expenditures, but questions the Commission's failure to quantify the exact amount that would be attributable to the proposed coal traffic. The Commission concluded that, in light of the magnitude of the coal movements at issue, "in view of the cost of locomotives (in excess of $500,000) and the large number involved here, the threshold requirement of $1 million is clearly met." HL&P J.A. at 47-48. This approach is reasonable, and the locomotive expenditures in themselves constitute substantial evidence supporting the Commission's finding that § 10729 was properly invoked.
 
 
 42
 AEPC offered evidence that the railroads had available sufficient locomotives to move its coal traffic, and therefore had no need to make their proposed expenditures for eight locomotives. In the face of conflicting evidence in the record, it is not this court's function to weigh again the evidence carefully considered by the Commission.[31] The Commission was entitled to credit the railroads' evidence as to the need for locomotives, and to do so in the context of its observation that coal shipments of the magnitude involved in the AEPC case normally require additional equipment.
 
 E. Scope of Commission Consideration
 
 43
 We close this section of the opinion by taking account of the concerns that seem to underlie the vigorous efforts of petitioning shippers to restrict the scope of § 10729 and to rebut the railroads' evidentiary showing under the $1,000,000 threshold requirement. Petitioners fear that treatment of a rate under § 10729 will deprive shippers of their protections under the Interstate Commerce Act. In their view, § 10729 requires only a cursory examination, under truncated procedures, by the ICC of the lawfulness of a proposed capital incentive rate, while it provides an extraordinary protection from further challenge for five years. Counsel for the Commission fuels this concern by the comment that "Congress necessarily contemplated no more than a summary assessment by the Commission of the various factors that go into the concept of 'lawfulness' of a rate schedule." ICC Brief at 14.
 
 
 44
 Congress permitted the Commission to dispense with some technical procedural formalities in the interest of expedition,[32] but this does not bestow power to dispose cavalierly of challenges to the lawfulness of the proposed rule. Taking into account the significance of the five-year immunity from ICC reconsideration, the requirement of expedition in the consideration of proposed rates does not grant permission to withhold fair and realistic consideration of rates; it is rather a direction to conduct such consideration as a first order of business, and without dawdling. An agency can get to the heart of a matter without undue formality in procedure, such as has often been ascribed, rightly or wrongly, to the ICC. Yet Congress in § 10729 incorporated by reference the substantive regulatory provisions of the Interstate Commerce Act as a whole.[33] Congress further provided that upon protest by an interested party, the Commission was to conduct a proceeding to determine compliance of the new rate with the terms of the Act.[34] The Act retains the requirement of meaningful consideration of the factors that are material in appraising legality of proposed rates; it permits expedition and procedures that move briskly to the heart of the matter.[35]
 
 
 45
 The scope of § 10729 is illuminated by contrasting it with § 10707 of 49 U.S.C.,[36] another codified provision initially added by the Reform Act. Section 10707 modifies the procedures applicable to the filing of new rates by railroads and governs all new rate filings to which § 10729 does not apply. Like § 10729, § 10707 imposes deadlines on the Commission: a decision on the lawfulness of a new rate must be reached within seven months, with a three-month extension permitted upon a report to Congress explaining the reasons for the delay. Suspension is permitted for seven months, or, if a report is made to Congress, for ten months. If the Commission fails to meet the deadline, the rate (if suspended) goes into effect, with no provision for refund. The rate may be set aside, however, if the Commission subsequently finds it to be unlawful.
 
 
 46
 Under § 10707 the Commission has discretion to dispense with formalized procedures (permitting the Commission to conduct its hearing without "answer or other formal pleading")[37] identical to that provided by § 10729. Yet whereas § 10707 makes a hearing following protest discretionary, it is significant that § 10729 provides that the Commission Shall conduct a hearing upon protest by an interested party.
 
 
 47
 Both sections reflect a congressional purpose to speed needed revenues to the railroads by reducing the delay that previously characterized the Commission's rate decisions. Both sections require a prompt Commission response, but in both sections Congress intended to work no change in substantive standards. These are to be applied with expedited procedures under provisions similar for both sections. The stricter hearing requirement in the section according an extraordinary benefit (§ 10729) reinforces the continuing duty of the Commission to give due and fair consideration to the factors material in determining lawfulness of a proposed capital incentive rate.[38]
 
 
 48
 III. ICC DETERMINATIONS OF LAWFULNESS OF PROPOSED RATES
 
 A. Reviewability and Scope of Review
 
 49
 Before turning to the Commission's determinations as to the lawfulness of the proposed capital incentive rates, we are confronted with a question of the scope of review of the Commission's orders on this point.
 
 
 50
 Intervenor railroads point to § 10729(b), which permits a capital incentive rate to become effective unless the Commission decides within 180 days after the filing of a notice of intent that the proposed rate would violate the Interstate Commerce Act. Once the rate becomes effective, "the Commission may not, for 5 years, suspend or set it aside as violating" the substantive regulatory provisions of the Act. In intervenors' view, this language deprives the Commission of authority to find a capital incentive rate unlawful and to set it aside even when a reviewing court has remanded the Commission's initial decision approving the rate because of defects under the Administrative Procedure Act.
 
 
 51
 To deny the Commission authority to correct its errors on remand is effectively to negate judicial review of the Commission's substantive determinations.[39] If a court may not, on finding legal error, remand to the Commission to reconsider its conclusion that the incentive rate is unlawful, then judicial review is an idle ceremony.[40] Indeed, it is worse than no review, for it provides the trapping of judicial affirmance when there is no meaningful judicial consideration.[41]
 
 
 52
 We have considered whether in this instance there exists the "clear and convincing evidence" necessary to a conclusion that Congress intended to restrict such review. Dunlop v. Bachowski, 421 U.S. 560, 567, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975), Abbott Laboratories, Inc. v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Congress has on occasion forbade judicial review of the validity of agency determinations (except for constitutional issues) and when such an intent is articulated the courts will respect it.[42]
 
 
 53
 While there is a rudimentary logic in the contention of intervenor railroads, we do not discern either in the framework, text or legislative history of this statute the indicia of such a legislative intent. In our view, what the statute means is that the Commission has no authority to provide agency-generated reconsideration of its approval of a rate whether the approval is expressed positively, in an order, or passively, by failure to intercede. But when a court holds that agency approval is infirm, it may provide, as an incident to judicial review, for agency reconsideration. Thus, in International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 446, 478 F.2d 615, 650 (1973), we concluded that a requirement that the Administrator of EPA enter within 60 days a decision on automobile manufacturers' petitions for suspension of emission standards did not preclude further EPA consideration on remand.
 
 
 54
 There is no significant legislative history on the issue.[43] The legislative understanding that we have discerned finds support in the Reform Act's structuring of § 10729 as a pre-filing review procedure. Section 10707, which governs all new rate filings by railroads that do not qualify under § 10729, defines the circumstances under which the Commission may "suspend" a rate pending determination of its legality, or "set aside" a rate filing that has become effective but which the Commission subsequently finds unlawful. Section 10729 establishes an alternate procedure for capital incentive rates. Under that section, the Commission must pass on the rate before it may be filed, though the standards it applies are identical. Once the rate is filed and becomes effective, the Commission may not "suspend" it or "set it aside". This structuring of § 10729 as a pre-filing procedure and the complementary language of the two sections strongly indicate that what Congress had in mind in enacting § 10729 was to preclude recourse by opponents of a rate filing to the conventional procedures of § 10707 after the capital incentive rate was filed.[44] While Congress clearly intended to prevent the Commission from reopening the merits of a capital incentive rate, we find nothing suggesting that it envisioned that the initial decision approving the rate and immunizing it from further ICC consideration, would also immunize the rate from judicial review for arbitrariness or departure from specific legal requirements.
 
 
 55
 Intervenors suggest that Congress realized that extended judicial proceedings, like protracted litigation before the Commission, would inhibit investment because such proceedings would contribute to uncertainty about the legality of proposed rates. The dominant chord of Congress's actions in the Reform Act is the need to remedy delay by the Commission.[45] Thus, even the Senate Report cited by intervenors identifies this as the concern underlying § 10729: "large-scale initiatives may be thwarted by delays in the exercise of the Commission's ratemaking powers."[46] There was no explicit mention of delays in the courts.
 
 
 56
 Nor does judicial review portend the practical impact intervenors fear. The direction to the agency to provide expedition will be taken to heart by the courts, as an indication of legislative policy. See International Harvester, supra, 155 U.S.App.D.C. at 425-28, 478 F.2d at 629-32. Furthermore, courts apply a deferential standard in judging rate determinations. As summarized by Mr. Justice Marshall:
 
 
 57
 Such decisions "are not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power." Manufacturers R. Co. v. United States, 246 U.S. 457, 481, 38 S.Ct. 383, 389, 62 L.Ed. 831 (1918). As this Court has observed, "The process of rate making is essentially empiric. The stuff of the process is fluid and changing the resultant of factors that must be valued as well as weighed. Congress has therefore delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems." Board of Trade of Kansas City v. United States, 314 U.S. 534, 546, 62 S.Ct. 366, 86 L.Ed. 432 (1942).
 
 
 58
 Atchison, T. & S. F. Ry. v. Wichita Board of Trade, 412 U.S. 800, 806, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973) (plurality opinion). The congressional interest in encouraging large-scale investments by minimizing regulatory uncertainty, coupled with sensitivity to the time pressure under which the Commission must operate in capital incentive proceedings, suggest that this standard be applied with an extra dollop of deference. While modification of the formulation of the standard is not necessarily called for, our review will be directed primarily at ascertaining that the Commission's decision reflects meaningful consideration of the salient factors and comports with applicable law.
 
 B. Reasonableness of Proposed Rates
 
 59
 In concluding that the rates proposed in each proceeding were just and reasonable, the Commission considered several factors: rates prevailing on movements of comparable traffic, and costs incurred by the carrier in providing the service, the need of the railroads to attract equity capital and the value of service to shippers. Bearing in mind that determinations of the reasonableness of rates are primarily the province of the agency charged with that assessment, we find the Commission's determinations to reflect full consideration of the evidence and the salient factors.
 
 1. Comparable Rates
 
 60
 The parties in each proceeding adduced conflicting evidence as to the rates, measured in mills per ton/mile, prevailing on comparable traffic. The Commission, in the main, credited the railroads' evidence and rejected the comparable rates offered by the utilities as outdated, and as not reflecting the impact of inflation and the increased value of service of coal traffic in light of the current energy situation. HL&P, in essence, takes issue with the Commission's conclusion as contrary to the weight of the evidence. AEPC argues, in addition, that the Commission's determination in its case is plainly wrong because the allegedly comparable rates offered by the carriers applied to single car, and not unit-train service. Railroad counsel at oral argument responded to this contention by asserting that the movements relied upon by the Commission were in fact volume movements of coal, with costs that are perhaps not as low, but within the same range, as unit train movements.
 
 
 61
 This latter dispute illustrates that this court is hardly equipped to exercise its judgment in assessing the evidence in place of the expertise of the Commission. We therefore find no basis on which to overturn the Commission's determinations. We do note that in any event, the Commission was careful to limit the significance of its comparable rate determinations, denominating such evidence only one indicium (and not a conclusive one) of the reasonableness of rates. See HL&P J.A. at 54; AEPC J.A. at 61-63.
 
 2. Cost Evidence
 
 62
 As to HL&P's coal traffic, the Commission determined the railroads' variable costs to be $9.59 per net ton, and their fully allocated costs to be $12.86 per net ton. The Commission concluded that a rate of $15.60 per net ton, which would recover 163 per cent of variable costs and 121 per cent of fully allocated costs, came within the "zone of reasonableness," though it fell on the high end of the range. The Commission rejected, however, a rate of $16.54 as exceeding a maximum reasonable level. HL&P J.A. at 54-59. As to AEPC's traffic, the Commission found variable costs of $5.44 per net ton, and fully allocated costs of $6.94. It found just and reasonable the proposed rate of $8.64 per net ton, which recovered 159 per cent of variable costs and 124 per cent of fully allocated costs. AEPC J.A. at 63-67.
 
 
 63
 Petitioners allege numerous errors in the Commission's assessment of the cost evidence. The evaluation of evidence of carrier costs of providing a service is a function peculiarly for agency expertise.[47] We apply our narrow standard of review and conclude that the Commission's cost determinations are supported by substantial evidence.[48]
 
 3. Need to Attract Equity Capital
 
 64
 A more difficult question is posed by the Commission's treatment of the need to attract equity capital. The Commission concluded that the need to attract equity capital justified the excess revenues above variable or fully allocated costs that would be generated by the proposed rates. In view of petitioners' objections, the Commission did not incorporate the cost of equity capital directly into its cost calculations. But it did take that factor into account. "We are convinced that the consideration of rail need to attract equity investment is appropriate in a capital incentive rate proceeding." HL& P J.A. at 56; See AEPC J.A. at 65-67.
 
 
 65
 The Commission found guidance in another section added to the Interstate Commerce Act by the Reform Act. That section, now revised and codified as 49 U.S.C. § 10704(a)(2),[49] mandates a "continuing effort" by the Commission to "assist (rail) carriers in attaining revenue levels" that are "adequate . . . to cover total operating expenses . . . plus a reasonable and economic profit or return (or both) on capital employed in the business." The statute goes on to prescribe that such revenue levels should "permit the raising of needed equity capital" and "attract and retain capital in amounts adequate to provide a sound transportation system in the United States."
 
 
 66
 While it did not prescribe specific standards by which to determine the adequacy of revenue levels deeming that effort inappropriate in view of the then-pending rulemaking directed to the question[50] the Commission in both cases felt that consideration of overall revenues was nonetheless desirable in light of the strong congressional policy embodied in § 10704(a)(2). The Commission emphasized the particular importance of this consideration in capital incentive rate proceedings, where the congressional purpose to encourage large-scale investment with the concomitant need to raise capital was especially acute. Thus, recovery of revenues in excess of fully allocated costs was justified in these cases. The Commission explained its reasoning (also implicit in the HL&P decision) in its AEPC order: "since much railroad traffic moves at rates below fully allocated costs because of competitive pressures, a railroad must be allowed to set some rates in excess of their full cost level where competition, market conditions and demand permit." AEPC J.A. at 67.
 
 
 67
 Petitioners assert that the new rule of ratemaking enunciated in § 10704(a)(2) was intended by Congress to apply only where railroads do not have "market dominance" I. e., where the play of competitive forces can be expected to hold rates down without the need for regulatory intervention. Within the zone of market dominance, petitioners argue, Congress intended "continued and unchanged" regulation of rates. HL&P Brief at 59. And, under traditional principles, a carrier's revenue needs had no relevance to the determination of the reasonableness of any individual rate.[51]
 
 
 68
 Application of the policy of § 10704(a)(2) to the rates at issue in capital incentive rate proceedings represents a permissible exercise of the Commission's ratemaking discretion.
 
 
 69
 Absence of market dominance deprives the Commission of jurisdiction to find a rate unreasonably high.[52] Nothing in the language, structure or history of the Reform Act suggests that § 10704(a)(2) is limited to situations where market dominance is absent. Indeed, since the Commission's jurisdiction to review rates at all where dominance is not present is limited, Congress must have intended the modification in regulatory approach effected by § 10704(a) (2)'s command to apply primarily where the regulatory regime still prevails, I. e., where market dominance is present. The legislative history is not to the contrary. The House Committee noted: "where effective market competition does not exist, regulation to protect against abuse of market power must be and is retained."[53] Obviously, however, the retention of a regulatory regime where abuse of market power is a danger does not preclude congressional modification of the regulatory approach.
 
 
 70
 The same analysis in effect disposes of AEPC's objection to the Commission's consideration of value of service the relative inelasticity of demand for the transportation of coal in determining the reasonableness of the $8.64 rate applicable to AEPC's coal traffic. The Commission concluded that § 10704(a) (2)'s command permits some rates to be set at a level exceeding fully allocated costs in order to compensate for those rates which must be set at less than fully allocated costs to meet competition from other transport modes. This was neither arbitrary nor forbidden by the Act. It is pertinent to the objective of providing an adequate overall level of earnings. If traffic with a high value of service is viewed in isolation it bears a heavy burden. Yet all shippers ultimately benefit when the rail carriers are able to generate revenues needed for survival.
 
 
 71
 It is not a fatal flaw that some traffic is carried at rates above total cost; the revenues from such traffic when added to revenues from traffic that competition requires be carried at less than full cost (but with some contribution to fixed costs), yield adequate overall revenues. This does not imply that the rail carriers are free to charge whatever the traffic will bear. In this very case, the Commission did put limits on some proposed rates, rejecting the $16.54 rate proposal of the carriers for HL&P's traffic.
 
 
 72
 Finally, HL&P questions the two "proxy tests" adopted by the Commission as "indicia of revenue need" in the absence of regulations prescribing specific standards for measuring revenue requirements. One proxy employed an 11 per cent cost of equity capital in the restated computation of costs. The other seems to add a weighted before-tax rate of return based on a percentage of cost. We acknowledge problems in tracking and understanding the Commission's approach. Several interrelated considerations ease our task. First, there is a judicial disposition to withhold intervention in rate matters when, as here, the complaint is not to the level of return but to the methodology. See FPC v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1943). The court still has a duty to assure application of reasonable standards. However, the standard of judicial review, which is narrow in general for ratemaking, and which is tightened for incentive ratemaking when agency and court are under constraints of expedition, is pinched to the point of exiguity when what is involved is an agency action under a temporary approach in force only pending completion of a more fully considered proceeding.[54] Although the path of the agency is only dimly discerned, we are not prepared to say it is an abdication from reason.
 
 4. Public Interest
 
 73
 The petitioning utilities contend that in focusing on the revenue needs of carriers, the Commission has not taken due account of the public interest, specifically, the interests of consumers who will bear the transportation costs through increased electric rates. The State of Texas, as amicus curiae, invokes the interests of the public at large in encouraging conversion to domestic coal as an energy source.
 
 
 74
 The Reform Act does enunciate a congressional policy "to balance the needs of carriers, shippers and the public."[55] While the Commission's decisions do not address the public interest explicitly, they reflect a permissible balancing of the pertinent interests. In the broad, neither the interest of electric consumers in lower rates nor that of the public in coal conversion dictates that the railroads must receive compensation for their services inadequate to maintain financial soundness. On the other hand, the congressional purpose of preserving and restoring a financially viable rail system does not free the Commission from its obligation to apply the just and reasonable standard so as to prevent rail carriers from extracting monopoly profits beyond the revenue levels necessary to effect those purposes. Again we note the unusual circumstances of these cases, which arose before the Commission had fully developed its revenue guidelines. We do not find warrant for judicial intervention on the ground that the Commission has failed to meet its obligation to balance pertinent interests.[56]
 
 C. Partial Rejection of Proposed Rates
 
 75
 HL&P contends that the Commission had no authority to permit the carriers to establish the capital incentive rate schedule when it had found portions of that schedule the $16.54 flat rate and the escalation provision that accompanied the $15.60 rate unlawful. In HL&P's view, any proposed capital incentive rate schedule must stand or fall as a whole; while "minor technical deficiencies" may be corrected, any legal defect in the schedule requires that it be rejected in its entirety.
 
 
 76
 HL&P relies on language formerly in the Act, but dropped by the codification that was intended to work no substantive change.[57] We do not believe § 10729 to be so lacking in flexibility as to prohibit the Commission from determining the lawfulness of a rate in a capital incentive rate proceeding, when that rate is encompassed within the initial filing, when the record contains evidence supporting that determination, and when the Commission has given full consideration to the lawfulness of the rate. To hold otherwise would be to mandate pointless, inefficient repetition of the capital incentive proceedings and to impair the congressional purpose of expedition. The language of § 10729, which does not support this technical objection, fairly reflects the legislative purpose. See Carolina, Clinchfield & Ohio Ry. v. ICC, 193 U.S.App.D.C. 151, 593 F.2d 1305 (1979).
 
 IV. CONCLUSION
 
 77
 In enacting the Reform Act, Congress struck a balance between the needs of shippers, carriers and the public. One aspect of this balance is § 10729, which strives to encourage investment in needed rail facilities by requiring expedited consideration of incentive rates, and by granting approved rates a 5-year immunity from attack. Congress did not limit the types of investment to which the section would apply, but it also intended no change in the standards by which capital incentive rates would be evaluated. In our view, the Commission has given due consideration in these cases to the relevant factors entering into a determination of reasonableness. Its decisions approving the proposed capital incentive rates are
 
 
 78
 Affirmed.
 
 
 
 [1]
 Pub.L.No.94-210, 90 Stat. 41
 
 
 [2]
 Section 10729 provides in full:
 (a) A proposed rate, classification, rule, or practice for transportation by a rail carrier subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title requiring a total capital investment of at least $1,000,000 to implement shall be established and become effective under this section. This section applies whether the investment is made individually or collectively by the carrier or by a shipper, receiver, or agent for any of them, or by a third party.
 (b) A rail carrier may file a notice of intent to establish a rate, classification, rule, or practice under subsection (a) of this section with the Commission. The notice must include a sworn affidavit detailing the anticipated capital investment. Unless the Commission after holding a proceeding under subsection (c) of this section, decides by the 180th day after the notice is filed that the proposed rate, classification, rule, or practice would violate this subtitle, the carrier may establish that rate, classification, rule, or practice at any time during the next 180 days, and it may become effective 30 days after it is established. Once a rate, classification, rule, or practice becomes effective under this section, the Commission may not, for 5 years, suspend or set it aside as violating section 10701, 10726, 10741-10744, or 11103 of this title. However, the Commission may order the rate, classification, rule, or practice to be revised to a level equal to the variable costs of providing the transportation when the Commission finds the level then in effect reduces the going concern value of the carrier.
 (c) On request of an interested person, the Commission shall hold a proceeding to investigate and determine whether the rate, classification, rule, or practice proposed to be established under this section complies with this subtitle. The Commission must give reasonable notice to interested parties before beginning a proceeding under this subsection but may act without allowing an interested party to file an answer or other formal pleading.
 Section 10729 revised and codified § 15(19) of the Interstate Commerce Act, 49 U.S.C. § 15(19) (1976). See Pub.L.No.95-473, 92 Stat. 1337 (1978). For convenience we refer to the new section. Although the codification was intended to work no substantive changes, some of the changes in language do bear on the issues here and will be noted where appropriate.
 
 
 [3]
 See 49 U.S.C. § 10704(a)(1), Pub.L.No.95-473, 92 Stat. 1373 (1978) (revising and codifying Interstate Commerce Act § 15(1), 49 U.S.C. § 15(1) (1976). Technically, HL&P challenged an existing "paper rate" I. e., a rate at which no traffic moved of $40.00 per ton. This complaint case was dismissed as moot by the Commission following its decision on the capital incentive rate filing
 
 
 [4]
 49 C.F.R. § 1109.20 (1978)
 
 
 [5]
 Id., § 1109.20(e)
 
 
 [6]
 No. 36608, Incentive Rate on Coal Cordero, Wyoming to Smithers Lake, Texas (served Nov. 30, 1977)
 
 
 [7]
 No. 36612, Incentive Rate on Coal Gallup, New Mexico to Cochise, Arizona (served Nov. 28, 1977)
 
 
 [8]
 Interstate Commerce Act § 15(19), 49 U.S.C. § 15(19) (1976) (revised and codified as 49 U.S.C. § 10729 by Pub.L.No.95-473, 92 Stat. 1389 (1978))
 
 
 [9]
 49 U.S.C. § 10729(a), quoted in full in note 2 Supra
 
 
 [10]
 See Grain in Multiple-Car Shipments River Crossings to the South, 318 I.C.C. 641 (Division 2), Reversed, 321 I.C.C. 582 (1963) (Full Commission), Reversed sub nom. Cincinnati, N. O. & T. P. Ry. Co. v. United States, 229 F.Supp. 572 (S.D.Ohio 1964), Vacated per curiam sub nom. Arrow Transport Co. v. Cincinnati, N. O. & T. P. Ry. Co., 379 U.S. 642, 85 S.Ct. 610, 13 L.Ed.2d 550 On remand, 325 I.C.C. 752 (1965)
 
 
 [11]
 H.R. 12891, § 5, 93rd Cong., 2d sess. (1974), Reprinted in Surface Transportation Legislation: Hearings before the House Comm. on Interstate and Foreign Commerce and the Subcomm. on Transportation and Aeronautics, 93rd Cong., 2d sess. 20-21 (1974)
 
 
 [12]
 Surface Transportation Legislation Hearings, supra note 11, at 279
 
 
 [13]
 H.R. 5385, § 307, 93rd Cong., 2d sess. (1974), Reprinted in H.R.Rep.No.93-1381, 93rd Cong., 2d sess. 10 (1974) (emphasis supplied)
 
 
 [14]
 H.R.Rep.No.93-1381, Supra note 13, at 28; See also 120 Cong.Rec. 38,736 (1974) (remarks of Rep. Adams)
 
 
 [15]
 H.R. 7681, § 5(a), 94th Cong., 1st sess. (1974), Reprinted in Railroad Revitalization: Hearings Before the Subcomm. on Transportation and Commerce of the House Comm. on Interstate and Foreign Commerce, 94th Cong., 1st sess. 49-50 (1975)
 
 
 [16]
 Railroad Revitalization Hearings, supra note 15, at 158
 
 
 [17]
 H.R. 6351, § 306, 94th Cong., 1st sess. (1975), Reprinted in Railroad Revitalization Hearings, supra note 15 at 23-25
 
 
 [18]
 H.R. 10979, § 303, 94th Cong., 1st sess. (1975), Reprinted in H.R.Rep.No.94-725, 94th Cong., 1st sess. 14 (1975)
 
 
 [19]
 H.R.Rep.No.94-725, Supra note 18, at 72 (emphasis supplied)
 
 
 [20]
 S. 2718, § 107, 94th Cong., 1st sess. (1975), Reprinted in S.Rep.No.94-499, 94th Cong., 1st sess. 218 (1975) (section applies "if the implementation of such schedule is contingent upon a total capital investment . . . in the amount of $1,000,000 or more")
 
 
 [21]
 S.Rep.No.94-499, Supra note 20, at 52
 
 
 [22]
 Id. at 15-17; H.R.Rep.No.94-725, Supra note 18, at 53-55
 
 
 [23]
 Reform Act, § 101(a), 45 U.S.C. § 801(a) (1976)
 
 
 [24]
 E. g., 49 U.S.C. § 11101(a), Pub.L.No.95-473, 92 Stat. 1419 (1978) (revising and codifying Interstate Commerce Act, § 1(4), 49 U.S.C. § 1(4) (1976) (duty to "provide the transportation or service on reasonable request")); 49 U.S.C. § 11121(a), Pub.L.No.95-473, 92 Stat. 1421 (1978) (revising and codifying Interstate Commerce Act, § 1(11), 49 U.S.C. § 1(11) (1976) (duty to "furnish safe and adequate car service")); Private Cars, 50 I.C.C. 652, 671 (1918)
 
 
 [25]
 Rate Incentives for Capital Investments, 353 I.C.C. 754 (1977)
 
 
 [26]
 Id. at 758
 
 
 [27]
 Id. at 758, 759
 
 
 [28]
 Id. at 758
 
 
 [29]
 Id. at 780
 
 
 [30]
 A different result may obtain where the qualifying investment is made in whole or in part by the shipper. Outside investment would obviously be discouraged if shippers could not rely on rate assurances received from railroads. The Commission has proposed amendments to its current regulations to incorporate a requirement of good faith negotiations where the shipper has invested $1,000,000 or more. We do not, of course, comment on the proposed regulations, but we do note that the Commission views the negotiation requirement as applying only "where both the railroad and a shipper made qualifying investments." 43 Fed.Reg. 23,062 (1978)
 
 
 [31]
 See Consolo v. FMC, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); Environmental Defense Fund v. EPA, 179 U.S.App.D.C. 43, 48, 548 F.2d 998, 1003 (1976); Salem Trans. Co. v. United States, 285 F.Supp. 322, 324 (S.D.N.Y.1968) (three judge court) (Friendly, J.)
 
 
 [32]
 49 U.S.C. § 10729(c) (Commission may act "without allowing an interested party to file an answer or other formal pleading"); Compare Interstate Commerce Act, § 15(19), 49 U.S.C. § 15(19) (1976) (§ 10729's predecessor) ("hearing may be conducted without answer or formal pleading")
 
 
 [33]
 Id. § 10729(b)
 
 
 [34]
 Id. § 10729(c)
 
 
 [35]
 Cf. Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 14-19, 420 F.2d 577, 582-87 (1969) (because of presence of serious anti-trust questions, hearing was required; petitioners were not obligated to develop in detail controversial factual issues when under 12-day deadline)
 
 
 [36]
 Pub.L.No.95-473, 92 Stat. 1380 (1978) (revising and codifying Interstate Commerce Act, § 15(8), 49 U.S.C. § 15(8) (1976))
 
 
 [37]
 The recent codification, See note 2 Supra, has muddied somewhat the applicability of the modified hearing procedures contained in § 10707, which apparently seems to say that the Commission's decision to act without "answer or other formal pleading" by an interested party applies only to "its decision to begin the proceeding." No such limitation, if that it be, appears in § 10729. Nor does it appear in § 10707's predecessor, § 15(8) of the Interstate Commerce Act, 49 U.S.C. § 15(8) (1976). In language identical to that of § 10729's predecessor, § 15(19) of the Act, 49 U.S.C. § 15(19) (1976), § 15(8) provides that where the Commission initiates a hearing, the hearing "may be conducted without answer or other formal pleading."
 
 
 [38]
 Although its counsel now suggests otherwise, the Commission itself has recognized that § 10729 requires full consideration:
 Nothing in section 15(19) (§ 10729's predecessor) purports to change substantively the traditional criteria by which determinations of unlawfulness are made. We perceive no fundamental inconsistency between the policies underlying section 15(19) and other sections of the Interstate Commerce Act. . . . The point is that the section preserves existing safeguards . . . since a meaningful investigation of the lawfulness of a proposed schedule must be conducted upon request.
 Rate Incentives, supra note 25, at 763-64. The Commission has proposed amendments to its current regulations implementing § 10729, 49 C.F.R. § 1109.20 (1978), that would require railroads to demonstrate that their proposed investments qualified under § 10729 prior to filing the notice of intent to establish a capital incentive rate. The purpose of this modification is to enable the Commission to carry out more effectively during the 180 days its primary function of assessing the lawfulness of the proposed rates. 43 Fed.Reg. 22,062 (1978).
 
 
 [39]
 There is no dispute that the Commission's decisions as to the qualification of any proposed investment for treatment under § 10729 are reviewable
 
 
 [40]
 Cf. Atchison, T. & S. F. Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 819, 93 S.Ct. 2367, 2381, 37 L.Ed.2d 350 (1973), Quoting Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 10, 62 S.Ct. 875, 86 L.Ed. 1229 (1942) ("If the administrative agency has committed errors of law for the correction of which the legislature has provided appropriate resort to the courts, such judicial review would be an idle ceremony if the situation were irreparably changed before the correction could be made")
 
 
 [41]
 See Public Service Comm'n v. FPC, 167 U.S.App.D.C. 100, 116, 511 F.2d 338, 354 (1975) (when legislature prescribes system of "regulation by an agency subject to court review the courts may not abandon their responsibility by acquiescing in a charade or a rubber stamping of nonregulation in agency trappings")
 
 
 [42]
 E. g., Midwestern Gas Transmission Co. v. FERC, 191 U.S.App.D.C. 80, 102-03, 589 F.2d 603, 625-26 (1978)
 
 
 [43]
 The bill reported by the House Committee on Interstate and Foreign Commerce in the 93rd Congress, which was passed by the House but died in the Senate, did contain the following subsection as part of its capital incentive provision:
 Failure of the Commission to hold a hearing . . . shall be considered agency action and shall be reviewable as such in accordance with chapter 7 of title 5, United States Code. The court may, in an action brought under such chapter 7, order the Commission to hold a hearing . . . . If the Commission is so ordered, it shall hold such a hearing, and if it makes the determination that the proposed schedule, or any part thereof, would be unlawful, it shall suspend the schedule even if such suspension is after (the approval period).
 H.R. 5385, § 307, Reprinted in H.R.Rep.No.93-1381, Supra note 13, at 10. The accompanying Committee Report contains no comment upon this section. But its inclusion might reflect a congressional understanding that judicial review was to extend only to the failure to hold the hearing mandated by the capital incentive provision. In that circumstance only could a rate be suspended for unlawfulness notwithstanding the expiration of the approval period. On the other hand, the section may have signified nothing more than a congressional intent to assure in this context the reviewability of Commission decisions not to investigate a proposed rate, a matter that as a general proposition has only very recently been resolved. See Southern Ry. Co. v. Seaboard Allied Milling Corp., --- U.S. ----, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979) (holding ICC decision not to investigate nonreviewable); Asphalt Roofing Mfg. Ass'n v. ICC, 186 U.S.App.D.C. 1, 8-9, 567 F.2d 994, 1001-02 (1977). On balance, we attach little significance to this provision, because of its omission from the Reform Act as ultimately enacted, and because of the absence of congressional explanation of its purpose.
 
 
 [44]
 Congress also presumably intended to preclude a challenge to the reasonability of an established rate by means of a complaint pursuant to 49 U.S.C. § 11701, Pub.L.No.95-473, 92 Stat. 1449 (1978) (revising and codifying Interstate Commerce Act, § 13(1), 49 U.S.C. § 13(1) (1976)), and prescription of a just and reasonable rate pursuant to 49 U.S.C. § 10704, Pub.L.No.59-473, 92 Stat. 1373 (1978) (revising and codifying Interstate Commerce Act, § 15(1), 49 U.S.C. § 15(1) (1976))
 
 
 [45]
 See S.Rep.No.94-499, Supra note 20, at 15:
 Not only is there a need to change the substantive standards by which the Commission regulates railroads, but to improve the regulatory process. There are presently grave limitations upon the ability of the Commission to properly perform its regulatory functions. . . . These all add up to excessive regulatory delay and erode the confidence of the public in needed regulation.
 
 
 [46]
 Id. at 52
 
 
 [47]
 The appraisal of cost figures is itself a task for experts, since these costs involve many estimates and assumptions and, unlike a problem in calculus, cannot be proved right or wrong. They are, indeed, only guides to judgment. Their weight and significance require expert appraisal
 New York v. United States, 331 U.S. 284, 328, 67 S.Ct. 1207, 1231, 91 L.Ed. 1492 (1947). Accord, Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 589-90, 65 S.Ct. 829, 89 L.Ed. 1206 (1945); National Ass'n of Greeting Card Publishers v. USPS (Fourth Postal Ratemaking), 197 U.S.App.D.C. --- at ---, 607 F.2d 392 at 401 (1979).
 
 
 [48]
 AEPC argues that the decision in its case is tainted by the consideration of "prejudicial and erroneous" evidence that was introduced by the railroads in the contemporaneous complaint proceeding instituted by AEPC. We agree with the Commission's conclusion that since the parties and factual issues in both proceedings were the same, AEPC could not have been prejudiced by consideration of the evidence adduced in the complaint proceeding. See AEPC J.A. at 69
 
 
 [49]
 Pub.L.No.95-473, 92 Stat. 1373 (1978) (revising and codifying Interstate Commerce Act, § 15a(4), 49 U.S.C. § 15a(4) (1976)). It provides:
 (2) The Commission shall maintain standards and procedures for establishing revenue levels for rail carriers providing transportation subject to its jurisdiction under that subchapter that are adequate, under honest, economical, and efficient management to cover total operating expenses, including depreciation and obsolescence, plus a reasonable and economic profit or return (or both) on capital employed in the business. The Commission shall make an adequate and continuing effort to assist those carriers in attaining revenue levels prescribed under this paragraph. However, a rate, classification, rule, or practice of a rail carrier may be maintained at a particular level to protect the traffic of another carrier or mode of transportation only if the Commission finds that the rate or classification, or rule or practice related to it, reduces or would reduce the going concern value of the carrier charging the rate. Revenue levels established under this paragraph should
 (A) provide a flow of net income plus depreciation adequate to support prudent capital outlays, assure the repayment of a reasonable level of debt, permit the raising of needed equity capital, and cover the effects of inflation; and
 (B) attract and retain capital in amounts adequate to provide a sound transportation system in the United States.
 
 
 [50]
 Promulgation of such standards was mandated by the Reform Act, See Interstate Commerce Act, § 15a(4), 49 U.S.C. § 15a(4) (1976) (superseded), and completed on January 31, 1978. See Ex Parte No. 338, Standards and Procedures for the Establishment of Adequate Railroad Revenue Levels (Jan. 31, 1978)
 
 
 [51]
 E. g., Scott County Milling Co., 194 I.C.C. 763, 785 (1933) ("Lack of adequate revenues from operations as a whole affords no reliable measure of the reasonableness of rates . . . on individual commodities"); See also Ayrshire Collieries Corp. v. United States, 335 U.S. 573, 592, 69 S.Ct. 278, 93 L.Ed. 243 (1959)
 
 
 [52]
 49 U.S.C. § 10709, Pub.L.No.95-473, 92 Stat. 1382 (1978) (revising and codifying Interstate Commerce Act, § 1(5)(b)-(c), 49 U.S.C. § 1(5)(b)-(c) (1976); See generally Atchison, T. & S. F. Ry. Co. v. ICC (Market Dominance), 188 U.S.App.D.C. 360, 580 F.2d 623 (1978)
 
 
 [53]
 H.R.Rep.No.94-725, Supra note 18, at 69
 
 
 [54]
 Cf. United States v. CAB, 167 U.S.App.D.C. 313, 511 F.2d 1315 (1975) (CAB order approving multilateral capacity reduction agreements among airlines was permissible as interim or emergency response to fuel crisis; but full review on nonemergency basis was required before CAB could approve further agreements); Public Service Comm'n. v. FPC, 151 U.S.App.D.C. 307, 317, 467 F.2d 361, 371 (1972) (FPC orders permitting advance payments by pipelines to producers of natural gas upheld in part because of temporary nature of program)
 
 
 [55]
 Reform Act, § 101(b)(1), 45 U.S.C. § 801(b)(1) (1976)
 
 
 [56]
 Petitioners' remaining contentions have been accorded full consideration. They merit only brief discussion. HL&P claims the Commission erred in failing to disapprove the carriers' refusal to provide transportation in carrier-supplied cars. The Commission noted the practice of shippers to furnish large capacity cars for unit-train coal shipments, and rejected HL& P's claim on the ground that it had already contracted for such specialized equipment. HL&P J.A. at 60. The issue is substantially controlled by Potomac Electric Power Co. v. United States, 190 U.S.App.D.C. 77, 81-82, 584 F.2d 1058, 1062-63 (1978). The court noted the evidence of record that most unit-train tariffs do not provide for carrier-furnished cars, and observed that "a railroad's obligation to furnish transportation service is defined by what it holds out to the public in its tariffs . . . and the furnishing of transportation under the unit-train tariff in question did not occur until the (cars furnished by the utility) were placed in the possession of the railroad for the line-haul movement." Id. at 81, 584 F.2d at 1062 Citing Eastern Cent. Motor Carriers Ass'n. v. Baltimore & O. R., 314 I.C.C. 5, 45-47 (1961), Complaint dismissed sub nom. Cooper-Jarrett, Inc., v. United States, 226 F.Supp. 318, 322-27 (W.D.Mo.), Aff'd, 379 U.S. 6, 85 S.Ct. 49, 13 L.Ed.2d 21 (1964) (per curiam). In a similar vein, AEPC contests the failure of the carriers to offer a mileage allowance for shipper-furnished cars. We accept the Commission's reasoning that such an allowance would be unjustified because the $8.64 rate applicable to AEPC's traffic already reflects transportation in shipper-supplied cars. AEPC J.A. at 67-68
 HL&P's and AEPC's claims of undue discrimination, and AEPC's objections to certain tariff items, are without merit. We agree with the reasons stated in the Commission's decisions.
 
 
 [57]
 Section 10729's predecessor, § 15(19) of the Interstate Commerce Act, 49 U.S.C. § 15(19) (1976), provided in pertinent part:
 Unless, prior to the 180-day period following the filing of such notice of intention, the Commission determines, after a hearing, that the proposed schedule, Or any part thereof, would be unlawful, such carrier may file the schedule . . . .
 (Emphasis supplied.) Section 10729 contains no "any part thereof" language. As to Congress's intent to work no substantive change, see Pub.L.No.95-473, § 3(a), 92 Stat. 1466 (1978).