**CELANESE CHEMICAL COMPANY, INC., Petitioner,**

v.

**The UNITED STATES of America and Interstate Commerce Commission, Respondents.**

No. 78–3651.

United States Court of Appeals, Fifth Circuit.

Unit A

Dec. 11, 1980.

Rehearing Denied Feb. 13, 1981.

Slover & Loftus, William L. Slover, C. Michael Loftus, Donald G. Avery, Washington, D. C., for intervenor–petitioner.

J. David Hughes, Stuart Fryer, Asst. Attys. Gen., Austin, Tex., for the State of Texas.

Robert Lewis Thompson, Atty., Dept. of Justice, Kathleen M. Dollar, Atty., I.C.C., Washington, D. C., R. Eden Martin, John Will Ongman, Washington, D. C., Richard J. Metzger, Chicago, Ill., for intervenors–respondents.

Paul M. Haygood, New Orleans, La., for The Denver and Rio Grande Western Railway Co., et al.

Before WISDOM, AINSWORTH and GEE, Circuit Judges.

AINSWORTH, Circuit Judge:

The Celanese Chemical Company petitions for review under 28 U.S.C. § 2321 of an Interstate Commerce Commission order approving a capital incentive rate for the shipment of coal from Colorado to Texas. The rate was proposed by The Atchison, Topeka and Santa Fe Railway Company (the Santa Fe) and The Denver and Rio Grande Western Railroad Company (the Rio Grande), intervenors–respondents in this action; the State of Texas intervened on behalf of Celanese.[1] The petitioners contend that the Commission erred in finding that the freight service qualifies for capital incentive rate treatment and in finding that the proposed rate was not unlawful. They also maintain that the Commission did not give proper consideration to the public interest and the federal energy policy in approving the rate. We agree that the Commission did not adequately consider the national energy policy in its determination and therefore remand the matter to the

---

1. The United States Department of Justice, on behalf of the United States as respondent, did not file any briefs or participate in the argument of this case, but did file a statement that it would "neither support nor oppose affirmance of the orders of the Interstate Commerce Commission under review."

This case was argued along with another case involving railroad rates for coal. *System Fuels, Inc. v. United States* (5th Cir. 1980) (No. 79–2491). In *System Fuels,* the Justice Department opposed affirmance of the Commission's order, agreeing with several of the contentions raised by the petitioners here, including the energy issue.

Commission for further consideration. We also find considerable merit in several of the petitioners' other contentions, and therefore direct the Commission to reevaluate fully the proposed rate.

## I. Background

Celanese engages in the production of chemicals at several facilities in Texas. Its Kings Mill, Texas, plant produces acetic acid using a process requiring enormous amounts of energy. Recently, in light of the national energy problems and the unstable supply and high price of oil and gas, Celanese converted the Kings Mill plant to the use of coal.[2] The plant requires 600,000 tons of coal per year, and the only feasible way of shipping such a quantity is by rail. Celanese therefore sought to reach agreement with the railroads on the rate to be charged for coal shipment. After the parties failed to agree on a rate, the railroads filed a notice of intent to establish a capital incentive rate of $10.56 per ton pursuant to 49 U.S.C. § 10729.[3] Celanese then filed a protest to the proposed rate and a petition to reject the notice of intent. The Commission, after reviewing written submissions of Celanese and the railroads (and after denying Celanese's request for a full, formal hearing), issued a brief decision on November 7, 1978, in which it ordered that the proposed rate go into effect. The Commission released a lengthy report on its decision on January 9, 1979.

This case arises out of the Commission's application of two different provisions: the capital incentive rate statute and the statutory policy requiring consideration of the carrier's overall revenue needs in ratesetting proceedings. Under Section 206 of the Railroad Revitalization and Regulatory Reform Act of 1976 (the 4–R Act), 49 U.S.C. § 10729, a carrier is permitted to file a schedule stating a new rate whenever the proposed schedule would require "a total capital investment of at least $1,000,000 to implement . . . ." This statute prescribed a relatively quick and simple procedure for establishing such capital incentive rates. After the carrier files a properly detailed and supported notice of intent to fix the rate, the Commission must decide within 180 days that the rate is unlawful or the rate becomes effective and cannot be set aside by the Commission as unlawful for five years. The capital incentive rate includes a fixed plant additive which compensates the carrier for the investment needed to implement the service.

Under Section 205 of the 4–R Act, 49 U.S.C. § 10704, the Commission is mandated to consider the adequacy of railroad revenues in setting rates. In *Ex Parte 338*, 358 I.C.C. 844 (1978), the Commission enacted rules to implement the revenue adequacy provisions. In addition to establishing standards to enable the Commission to assess the revenue needs of individual carriers, *Ex Parte 338* enunciated a policy that in order to offset certain rail traffic which, because of competition from other modes of transportation, cannot be charged rates sufficient to meet the carrier's costs,[4] the Commission will approve rates for other traffic in excess of costs.[5] In short, the Commission requires some shippers to subsidize others through differential pricing; the railroads are allowed to offer below–cost rates to certain shippers who have competitive transportation alternatives, and to make up

---

**2.** The conversion project cost Celanese $70,-000,000. Celanese Brief at 3.

**3.** Section 10729 was previously codified at 42 U.S.C. § 15(19); it is still referred to as § 15(19) in several of the briefs and in the Commission's decision.

**4.** Unless otherwise stated, the word "costs" will be used to refer to what will later be defined as "fully–allocated costs at the revenue–need level"; these costs include all variable and constant costs plus a fair return on

capital and an amount needed to attract additional capital.

**5.** It may often make economic sense for a carrier to charge rates below full costs if that is all it can get. As long as the rate exceeds the variable costs (the amount by which the railroad's costs would be reduced if it did not carry the traffic in question), the carrier would be better off accepting the rate even though it does not make a full contribution to the constant costs.

for this loss by setting rates at a level in excess of that needed to cover costs and assure revenue needs in situations where the shippers have no alternatives.

## II. The Rate Approved by the Commission

In the present case, the $10.56 per ton rate proposed by the railroad and approved by the Commission includes a fixed plant additive, an amount above "strict" costs to meet the railroad's revenue needs, and another additive attributable to differential pricing. The Commission found the strict variable cost of the service to be $6.24 per ton.[6] This amount includes $1.04 to cover the fixed plant investment required to implement the coal service. The strict, fully–allocated cost which equals the variable costs plus constant costs, was found to be $7.84 per ton. The strict, fully–allocated cost not including the fixed plant investment additive is thus $6.80 ($7.84 minus $1.04). The Commission then calculated the costs including the amount needed to meet the carrier's revenue needs, and found the fully–allocated costs at the revenue–need level to be $8.88 per ton. Thus, a second $1.04 additive ($8.88 minus $7.84) is attributable to revenue needs. Finally, in approving the $10.56 per ton rate, the Commission allowed a differential pricing additive of $1.68 ($10.56 minus $8.88); this amount theoretically compensates the railroads for the "loss" they take on other services where competition prohibits them from charging a rate based on fully–allocated costs at the revenue–need level. The $10.56 per ton rate is thus composed of the following amounts:

| | |
|---|---|
| (a) Strict, Fully-Allocated Costs (Not Including Amount Needed to Implement New Service) | $ 6.80 |
| (b) Revenue-Need Additive | 1.04 |
| (c) Fixed Plant Investment Additive | 1.04 |
| (d) Differential Pricing Additive | 1.68 |
| TOTAL RATE | $10.56 |

The propriety of the last two additives is vigorously contested in this case.

## III. Applicability of Capital Incentive Rates

A threshold issue in this case is whether the capital incentive rate provisions apply at all.[7] To be eligible for capital incentive rate treatment, the proposed service must require a total capital investment of $1,000,000 or more before it can be implemented. A rail carrier initiates the procedure by filing a notice of intent to establish such a rate; that "notice must include a sworn affidavit detailing the anticipated capital investment." 49 U.S.C. § 10729(b). Celanese contends that the Commission erred in allowing capital incentive rate treatment because the proposed service is not innovative and because the railroads did not sufficiently demonstrate the need for a capital investment of $1,000,-000.

---

**6.** Joint Appendix, Vol. I at 181. The Commission defines its cost terms as follows:

> Variable costs consist of: 1) the variable portions of freight operating expenses, rents and taxes (excluding Federal income taxes), and 2) the variable portion of the "cost of capital", excluding any allowance for Federal income taxes. Fully allocated costs consist of the variable costs plus an allocation of the constant costs which are composed of: 1) the constant portions of the freight operating expenses, rents and taxes (excluding Federal income taxes), and 2) the constant, or remaining, portion of the "cost of capital."

*Ex Parte 270 (Sub. 4), Investigation of Railroad Freight Rate Structure–Coal*, 345 I.C.C. 71, 226 (1974). More simply, variable costs have been defined as "those costs that vary with change in output" and constant costs as "relatively immutable expenses of maintaining operations, regardless of output." Langford, *Singing the Coal Train Blues: The ICC, Railroad Coal Hauling Rates, and National Energy Policy*, 11 St. Mary's L.J. 734, 755 (1980).

**7.** The Commission contends that its decision, even at this threshold level, is virtually immune from judicial review. Commission Brief at 11–13. We disagree. The Commission relies heavily on *Houston Lighting & Power Co. v. United States*, 606 F.2d 1131 (D.C.Cir.1979), but that case did thoroughly review the capital incentive rate issues including the issue of whether the capital incentive rate applied at all. 606 F.2d at 1137–43. Moreover, this threshold issue, as the District of Columbia Circuit noted, involves whether the Commission had jurisdiction to approve the rate; it certainly cannot claim any special deference over the jurisdictional question.

Although the statute makes no mention of any innovativeness requirement, the petitioners' contentions are not novel. There are several references in the legislative history to the desire of Congress to promote innovation, experimentation and new services.[8] The statute as passed applied to "new" rates, but the word new was deleted for no apparent reason when the Interstate Commerce Act was recodified in late 1978.[9] The issue of whether the statute requires that the service be innovative was litigated in *Houston Lighting & Power Co. v. United States*, 606 F.2d 1131 (D.C.Cir. 1979), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980). We agree with the District of Columbia Circuit that the service need not be novel or innovative. The House and Senate passed different bills relating to railroad revitalization, but it was the Senate bill which finally became law. The Senate Report made no mention of any innovativeness requirement; instead it spoke of an intent to "encourage capital investment" and to "contribute to the improvement of rail facilities and services." S.Rep.No. 94–499, 94th Cong., 2d Sess. 52 (1975), *reprinted in* [1976] U.S.Code Cong. & Ad.News 14, 67. The Conference Report indicates that the only differences between the House and the Senate on this part of the bill were procedural and unrelated to any innovativeness requirement. S.Rep.No. 94–595, 94th Cong., 2d Sess. 151–52, *reprinted in* [1976] U.S.Code Cong. & Ad.News 167. Presented with at most some very ambiguous evidence, we cannot construe this statute as requiring innovation when it makes absolutely no mention of such a requirement on its face.

Although we agree with the Commission and the District of Columbia Circuit that there is no innovativeness requirement in the capital incentive rate statute, we do not agree that a mere "nexus" or connection between the capital investment and the new service is sufficient to invoke the statutory provisions. The term nexus, commonly used in cases examining whether courts or governmental bodies have sufficient connection with persons, property or transactions to assert jurisdiction over them, or to tax or regulate them,[10] has come to connote a connection which may be quite attenuated. If, by requiring a nexus between the capital investment and the new service, the Commission and the District of Columbia court would require only an attenuated connection, we believe they are in error. In order to qualify for capital incentive rate treatment, the investment must be directly related to the new service and must be required by the new service. Moreover, the investment must create new capacity, not merely expand existing capacity. To illustrate, if a rail line is regularly used for the shipment of grain and the addition of a new grain shipper requires the carrier to purchase two locomotives at a cost of over $1,000,000, the capital incentive rate would not apply. It would be inequitable to make this new shipper pay more than other shippers pay for the same service. But if, on the same line, a shipper wished to initiate the transport of coal in long unit trains, the substitution of heavy for light track and the lengthening of sidings to accommodate the longer trains would qualify for capital incentive rate treatment. However, the purchase of locomotives, required by the increase in traffic and not by the fact that the new traffic consists of coal trains rather than grain trains, would not qualify.[11] On remand, the

8. See the discussion of the legislative history in *Houston Lighting & Power Co. v. United States, supra*, 606 F.2d at 1137–39.

9. The former language is contained in the 4–R Act, 90 Stat. 31, 41. It was codified at 42 U.S.C. § 15(19). *See* Joint Appendix, Vol. I at 1. The recodification intended to restate the laws "without substantive change." H.R. Rep.No. 95–1395, 95th Cong., 2d Sess. 4 (1978), *reprinted in* [1978] U.S.Code Cong. & Ad.News 3009, 3013.

10. *See, e. g., Exxon Corp. v. Wisconsin Dept. of Revenue*, —— U.S. ——, 100 S.Ct. 2109, 2118, 65 L.Ed.2d 66 (1980); *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 452, 79 S.Ct. 357, 359, 3 L.Ed.2d 421 (1959); *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 905 (1st Cir. 1980).

11. In this example, the new locomotives would be required if the expansion of traffic consisted of additional grain shipments instead of coal shipments. Of course, if specialized locomo-

Commission should reexamine the investments detailed by the carriers to insure that they are directly attributable to the new service and required by the nature of the new service.

■■■ The petitioners' contention that the railroads did not sufficiently demonstrate the need for the capital investment has merit. The statute requires the carrier to "detail" the anticipated investment in an affidavit accompanying the notice of intent. We read this to require a degree of specificity not found in the present case. The railroads' notice was accompanied by two affidavits, one by A. H. Nance, the General Manager of the Rio Grande, and another by T. D. Mason, the Assistant Vice President–Maintenance of the Santa Fe. The only investment noted in Nance's affidavit was the purchase of five locomotives.[12] Mason's affidavit cited a number of items:

> 4. In order to accommodate the proposed unit train on the lines of Santa Fe and to perform the operation economically, efficiently and safely, a number of additions to fixed plant will have to be as follows during 1978–1979:
>
> (a) At Campo, Colorado, a point on Santa Fe's line between Boise City, Oklahoma, and Springfield, Colorado, an existing passing track would be extended to accommodate the unit train at a total cost in excess of $100,000.
>
> (b) At Frick, Colorado, a point on Santa Fe's line between Springfield and Las Animas, Colorado, an existing passing track would be extended to ac-

> commodate the unit train at a total cost in excess of $200,000.
>
> (c) At Kings Mill, Texas, a power switch and signal appurtenances would be installed . . . at a total cost in excess of $250,000.
>
> (d) At Amarillo, Texas, a track connection, crossover and four power switches would be constructed with necessary signal appurtenances at a total cost in excess of $750,000.
>
> (e) At Puente, Texas, . . . an existing siding would be extended to accommodate the unit train at a total cost in excess of $350,000.
>
> (f) At Dumas, Texas, an existing siding would be extended to accommodate the unit train at a total cost in excess of $400,000.
>
> The foregoing capital projects total in excess of $2,050,000 for the period 1978–1979.

Joint Appendix, Vol. I at 21–22. Although the investments cited by Mason seem to be eligible for capital incentive rate treatment, the affidavit gives insufficient detail to allow the Commission or anyone questioning the rate to determine whether the investment is required for the new service, whether the cost figures are reasonable, and whether any portion of the investment should be allocated to other users.[13] Only after Celanese formally protested the proposed rate did the railroads produce more detailed information, and they then described a much larger investment, allocating portions of it to the Celanese traffic.[14] The

---

tives were required to accommodate the coal traffic, they would qualify for capital incentive rate treatment.

The reason for our distinction might be made more clear by another example: if a railroad owned sufficient locomotives to service 1,000 grain shippers of approximately equal size, and at present services only 999, it would be inequitable for the carrier to charge one rate for the 1,000th shipper but another, much higher rate for the 1,001st shipper under the capital incentive rate provisions. While it certainly can be said that the addition of the 1,001st shipper requires the purchase of additional equipment which may cost over $1,000,000, that shipper is really no different than the 1,000 others and should not be charged a different rate.

12. The Commission apparently agreed with Celanese that the locomotive investment did not qualify for capital incentive rate treatment. Joint Appendix, Vol. I at 115–16.

13. For example, one might wonder whether the switching and signalling devices and other items detailed in 4(c) and 4(d) of the affidavit are required for coal shipment or are merely a needed upgrading of the existing plant. These items account for $1,000,000 of the $2,050,000 investment claimed by Santa Fe.

14. See, e. g., Verified Statement of T. D. Mason, Joint Appendix, Vol. III at 795, in which an investment of $1,138,876 is allocated 35.2% to Celanese traffic without any explanation.

investments once again seem to qualify for capital incentive rate treatment, but the method of allocating the investment to Celanese and other traffic is not apparent. The railroads alone are in a position to show what investments must be made and how they should be allocated; they therefore have the burden of producing specific, detailed information with which the Commission and any opponents of the rate can assess the appropriateness of capital incentive rate treatment and the amount of investment attributable to the new service. On remand, the Commission should require such information.

IV. Lawfulness of the Rate [15]

█ As we noted in Part II above, the $10.56 per ton rate in this case is composed of the strict, fully–allocated costs plus three additives: $1.04 to meet the carriers' revenue needs, an additional $1.04 to cover the fixed plant investment required by the new service, and $1.68 to make up for other traffic which does not pay a full economic rate. The petitioners contend that this rate is unlawful in three respects. First, they contend that the Commission's use of the fixed plant additive for the new investment resulted in double counting of certain costs already included in the fully–allocated costs. Second, they argue that the Commission acted arbitrarily in approving the $1.68 additive to compensate the railroads for

deficiencies in other rates. Finally, the petitioners maintain that the Commission did not properly weigh the public interest in evaluating the lawfulness of the rate. We find merit in all of these contentions.

A. The Fixed Plant Investment Additive

█ The Commission uses a formula designated Rail Form A to calculate each railroad's "system average costs" to be allocated among the various shippers.[16] In this case, as in other capital incentive rate cases, the Commission added to the Rail Form A costs an amount reflecting the cost of the new capital investment required to implement the service. That additive was $1.04 per ton. Celanese contends that in using both Rail Form A and the capital incentive rate additive the Commission double counted certain costs. We agree.

In *San Antonio v. United States*, 631 F.2d 831 (D.C. Cir. 1980), the District of Columbia Circuit faced the identical issue and held that the Commission's procedure was unlawful unless it excluded from the Rail Form A calculation all investments of the same type as that included in the fixed plant investment additive. If the additive included investment in new rails, for example, all rail investment should be deleted from Rail Form A. The court cogently stated the reasons for its conclusion:

A previous capital incentive rate statute, which was codified at 49 U.S.C. § 15(19), was less clear on this point. Section 10729, however, is merely a recodification and clarification of the former statute without substantive change. H.R.Rep. No. 95–1395, 95th Cong., 2d Sess. 4–5 (1978), *reprinted in* [1978] U. S. Code Cong. & Ad. News 3013. The old statute thus must be presumed to mean the same as the new, clarified statute, which clearly does not apply to judicial review.

Moreover, even if Congress had not clarified the statute, we would not construe the law as precluding judicial review in the absence of a clear expression that Congress intended it to be nonreviewable. *Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975).

16. *See* Commission Brief at 30; Rules to Govern the Assembling and Presenting of Cost Evidence, 337 I.C.C. 298, 335–36 (1970).

15. In their briefs and in a letter filed by the railroads after oral argument, respondents contend that this court can only review the Commission's determination that the carriers' proposed rate qualifies for capital incentive rate treatment and not its determination that the rate itself is not unlawful. We disagree.

The respondents contend that the statute precludes the setting aside of the Commission's order by a court for a period of five years after the rate becomes effective. The language of the statute clearly refutes this assertion: "Once a rate, classification, rule, or practice becomes effective under this section, *the Commission may not*, for a period of five years, suspend or set it aside . . . ." 49 U.S.C. § 10729 (emphasis added). The statute merely precludes the Commission from setting aside its own order (or a rate established due to the failure of the Commission to make a timely order) within five years; it does not apply to judicial review.

The Commission's reasoning and methodology respecting the additive are murky at best. It appears the Commission discerned that summing the unadjusted Rail Form A costs with the additive would double count investment costs, and therefore the Commission purported to exclude from Rail Form A the specific investment amounts divided among the coal customers. While this exclusion is helpful, it does not go far enough. The Commission should have excluded not only the specific coal–related investments allocated by the additive, but should have entirely removed from Rail Form A all other investment amounts of the same character. . . .

The Commission apparently believed this [method] justified because coal shippers to some extent use ordinary rail (and other fixed plant) whose costs are not included in the additive. This may be true. But noncoal traffic may use the heavier rail (and other *coal–related* fixed plant) whose costs are no longer included in Rail Form A. This means that, pursuant to the ICC's methodology, coal shippers pay *all* costs for the coal–related fixed plant *and* share in other fixed plant costs as if they were noncoal shippers, while noncoal shippers pay *nothing* for their use of coal–related fixed plant and have their costs for fixed plant partially defrayed by coal shippers.

*San Antonio v. United States, supra,* at 843–844 (footnotes omitted). In its brief, the Commission acknowledged that it used the same method in this case as it did in its *San Antonio* decision. Brief at 33. We find that procedure to be as erroneous here as it was in that case.

### B. The Railroad's Revenue Needs and the Public Interest

■ The contentions that the Commission erroneously applied the 4–R Act in assessing the railroad's revenue needs and that it failed to weigh properly the public interest in approving the rate are considered together since they both relate to

the $1.68 additive. The 4–R Act requires the Commission to determine the needs of the railroads to secure adequate revenues and attract sufficient capital, and to take into account those needs when it reviews railroad rates.[17] In this case, the revenue needs of the railroads were addressed twice. First, the Commission, in moving from strict, fully–allocated costs to fully–allocated costs at the revenue–need level increased the strict–cost figure from $7.84 per ton to $8.88 per ton, an increase of $1.04 per ton. Joint Appendix, Vol. I at 181–82. The Commission described the $8.88 per ton figure as "the sum of money needed to attract debt and equity capital, in addition to the recovery of operating expenses, so as to ensure the financial stability of respondents in providing service." Decision and Report of Commission at 35, reproduced in Joint Appendix, Vol. I at 135. We find no error in this determination. However, the Commission did not approve a final rate of $8.88 per ton, but one of $10.56 per ton; the 19% increase from $8.88 to $10.56 was justified by the Commission as necessary to compensate for other, uneconomically low rates:

As the Commission explained (App. I, 130), its recent decisions have found that some rail rates must be allowed to substantially exceed fully allocated costs (including a fair rate of return or cost of capital element), in order to assist the railroads in moving toward an overall adequate revenue level. This principle is known as "differential pricing" and is based on the fact that some rail traffic moves at rates below fully allocated costs to meet competition from other modes. Therefore, if railroads are to generate adequate revenues to survive, other traffic, such as high value western coal, must be set at levels exceeding fully allocated costs.

Brief of the Commission at 35. The petitioners contend that the Commission's approval of the 19% additive was arbitrary and that it failed to take into proper account the interests of the public. We agree.

17. *See* 49 U.S.C. § 10704(a)(2).

The allowance of rates in excess of fully–allocated costs at the revenue–need level has been the subject of much dispute both before the Commission and the federal courts. The Commission and the carriers acknowledge that if all shippers paid a rate based on fully–allocated costs, there would be no justification for permitting higher rates. However, some of the railroad's services would not be competitive with other modes of transportation if their rate rail reflected fully–allocated costs, so the rate is set lower. The primary issue here is not whether it is lawful for the Commission to allow carriers to charge one group of shippers an extraordinarily high rate to make up for the extraordinarily low rates charged other shippers,[18] but how the higher rates should be allocated–to which shippers and at what level above fully–allocated costs.

▮ Petitioners first contend that the Commission acted arbitrarily in making what they characterize as a "quantum leap" from $8.88 to $10.56 per ton. Reply Brief of Celanese at 2. The Commission defends the rate as being "within the zone of reasonableness" and asserts that it must exercise "flexible judgment" in evaluating rates. Joint Appendix, Vol. I at 135. We find that the use of "flexible judgment" to determine whether a rate is within an undefined and seemingly broad "zone or reasonableness" is just the kind of arbitrary agency action which courts must condemn. *San Antonio v. United States, supra,* at 852–853. In this case, as in *San Antonio,* the increment above fully–allocated costs seems to have been pulled out of thin air; neither the Commission nor the railroads give any specific reasons for arriving at that figure. The Commission did not mention any standards used in evaluating the reasonableness of the 19% increment. This court cannot properly assess the Commission's actions when it supplies no reasoned analysis. *In re Permian Basin Rate Cases,* 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968).

18. The revenue adequacy provisions of the 4–R Act may be read to authorize some differential pricing. 49 U.S.C. § 10704(a)(2); *see also*

▮ In order to justify approval of rates above fully–allocated costs, the Commission should follow a set of guidelines like the one it promulgated in its *San Antonio* decision:

The question is one of determining the extent to which some shippers should subsidize others in the interest of producing a financially viable rail system. There is no simple formula for making that determination. Before the Commission can impose a substantial burden on some shippers, the railroads must show more than revenue need on a system basis. The Commission must have additional data, including (1) specific identification of the traffic that must be subsidized by other traffic and the reason why rates cannot be increased on that traffic; (2) the extent to which the railroads provide service on unprofitable branch lines and the reason(s) why such service cannot be made profitable or abandoned; (3) identification of commodities other than coal which could also make substantial contributions to the railroads' system revenue needs; and (4) identification and quantification of excess capacity on a carrier's system.

*San Antonio v. Burlington Northern, Inc.,* 361 I.C.C. 482, 495–96 (1979). On remand, the Commission should identify the traffic requiring subsidization, show why it needs the subsidy and quantify the needed subsidy. It should then identify the traffic which can contribute to the subsidy, and assess the reasonableness of the burden placed on this particular coal service in light of the overall size of the burden and the number and size of the shippers available to carry the burden.

▮ Another factor which the Commission must weigh in determining what, if any, increment above fully–allocated cost the shipper must pay is the public interest. The Commission acknowledges that it must consider the public interest, and states that it did so in this case:

*Houston Lighting & Power Co. v. United States, supra,* 606 F.2d at 1148.

Celanese and the State of Texas allege that the Commission erred in failing to consider the public interest. While the Commission did not specifically discuss the public interest, its decision reflects consideration of that interest. The Commission, in the exercise of its statutory authority, determines where the public interest lies on issues of rate lawfulness and the Court should not substitute its own judgment for that of the Commission.

The decision at issue demonstrates that the agency properly weighed and balanced the interests of both the shipper and the carriers. The statements submitted to the Commission by the parties emphasized the competing interests of the railroads' needs for revitalization and adequate revenues versus the nation's need to convert to the use of coal as a primary energy source.

Brief of Commission at 39–40. Ordinarily, we would agree with the Commission's assertion that in ascertaining the needs of the carrier and the shippers it has, in effect, taken into account the needs of the public. This is especially true in light of the fact that Congress, in the 4–R Act and in the Staggers Rail Act of 1980, has determined that it is in the public interest "to provide for the restoration, maintenance, and improvement of the physical facilities and financial stability of the rail system of the United States."[19] However, in this case another element of the public interest–the national energy policy–is at issue. We cannot accept an unsupported statement in the Commission's brief that it considered "the nation's need to convert to the use of coal as a primary energy source," without any mention of the energy issue in the Commission's decision, as sufficient reflection of this crucial policy in its determination.

Celanese embarked on an ambitious plan to convert its Kings Mill plant, and later other plants, to the use of coal. It estimated that the Kings Mill conversion alone

would save 10 billion cubic feet of natural gas per year. This kind of conversion is a keystone of our federal energy policy. As the Commission has itself acknowledged, "[n]ational energy policy, in addition to encouraging the conservation of existing scarce petroleum resources, also encourages development of the nation's coal reserves, particularly those in the western states." Interstate Commerce Commission, 1978 Annual Report, at 24. *See also* the Powerplant and Industrial Fuel Use Act of 1978, Pub.L. No. 95–620, § 102(a), 42 U.S.C. § 8301(a):

(a) Findings.–The Congress finds that–

(1) the protection of public health and welfare, the preservation of national security, and the regulation of interstate commerce require the establishment of a program for the expended [sic] use, consistent with applicable environmental regulations, of coal and other alternate fuels as primary energy sources for existing and new electric powerplants and major fuel–burning installations; and

(2) the purposes of this chapter are furthered in cases in which coal or other alternate fuels are used by electric powerplants and major fuel–burning installations, consistent with applicable environmental requirements, as primary energy sources in lieu of natural gas or petroleum.

All parties to this dispute acknowledge that transportation is a large portion of the cost of coal, and no one can dispute that the cost of coal in comparison to the cost of other energy sources is the primary factor which major industrial users will consider in deciding whether to use coal rather than oil or gas. Railroads enjoy a near monopoly in the transportation of coal. It is thus obvious that the establishing of railroad rates for the transportation of coal has a great impact on our national energy policy.

The energy policy implications of the Commission's decision might be considered irrelevant if the Commission's mandate was

---

**19.** Staggers Rail Act of 1980, § 3, *reprinted in* S.Rep. No. 96–1430, 96th Cong., 2d Sess. 3 (1980).

limited to balancing the needs of the shippers with those of the carriers. This is not the case, however. In addition to the general mandate to consider the public interest, Congress has specifically ordered the Commission to consider the impact of its regulatory actions on the national energy policy. *See* The Energy Policy and Conservation Act, Pub.L. No. 94–163, § 382 (1975); 42 U.S.C. § 6362. In its regulations implementing the provisions of this statute, the Commission provides for the preparation of energy impact statements for all "major regulatory actions" and for other actions which "may have important energy impacts." 49 C.F.R. §§ 1106.1–1106.8. An energy impact statement was not prepared in the present matter, and the Commission's decision and report reflect no consideration of energy issues. In light of the importance of coal to the national energy policy and the likelihood that a 19% premium over the full and fair rate for coal transportation would have a significant deterrent effect on conversions, we find that the Commission did not fully take into account the public interest when it approved the rate herein without preparing an energy impact statement or otherwise demonstrating comprehensive consideration of the energy impact. On remand, the Commission should fully and carefully evaluate the energy impact of the proposed rate and should weigh that impact in deciding whether to approve the rate.

V. Conclusion

For the foregoing reasons, this matter is remanded to the Commission for reconsideration in accordance with this opinion.

REMANDED.