SYSTEM FUELS, INC. and Arkansas Power & Light Company, Petitioners,

v.

The UNITED STATES of America and The Interstate Commerce Commission, Respondents.

No. 79–2491.

United States Court of Appeals, Fifth Circuit.

Unit A

April 8, 1981.

Rehearing and Rehearing En Banc Denied June 16, 1981.
See 648 F.2d 265.

6. *See Munno v. Amoco Oil Co.*, 488 F.Supp. 1114, 1116 n. 1 (D.Conn.1980).

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Edward B. Poitevent, II, New Orleans, La., J. Raymond Clark, Washington, D. C., for petitioners.

Gerald B. Fleming, Kathleen M. Dollar, Attys., ICC, Robert Lewis Thompson, John J. Powers, Dept. of Justice, Washington, D. C., for respondents.

Paul M. Haygood, New Orleans, La., R. Eden Martin, John Will Ongman, Washington, D. C., for intervenors, for Burlington Northern, Inc. and Missouri Pac. Railroad Co.

Before WISDOM, AINSWORTH and GEE, Circuit Judges.

GEE, Circuit Judge:

Arkansas Power & Light Company (AP&L), an electric utility, and System Fuels, Inc. (SFI), a fuel purchasing company, both members of the Middle South Utilities System (collectively referred to as "System" or "utility"), filed a complaint with the Interstate Commerce Commission (ICC or Commission), seeking prescription of the maximum reasonable rate for rail shipment of coal from Wyoming to an Arkansas electrical generating facility under construction for AP&L. After five years of unsuccessful negotiations, the railroad carriers (Burlington Northern and Missouri Pacific) had prescribed a transportation rate of $12.78 per ton of coal carried. Responding to the utility's complaint, the ICC examined the railroad's proposal. After fourteen days of hearings and over 1,500 pages of testimony, the administrative law judge determined that the maximum reasonable rate for this coal traffic equalled his computation of the fully allocated costs for the service—that is, $12.27 per ton. The railroads and the utility both objected to this determination before the full Commission. The Commission found the $12.78 proposed by the railroads just and reasonable and dismissed the utility's complaint. *Arkansas Power & Light Co. v. Burlington Northern, Inc.*, 361 I.C.C. 504 (1979).

The Commission's computation of fully allocated costs ($12.78) was not substantially higher than that of the ALJ ($12.27); the bulk of the $.51 cent increase in the "maximum reasonable rate" stemmed from the Commission's addition of a differential pricing increment (the so-called "seven percent solution" discussed below) to the proposed rate. From the dismissal of its complaint and the approval of the railroad's proposed rate, the utility seeks relief in this court.

We approach this task with both deference and respect:

Judicial review of decisions by the Interstate Commerce Commission in rate cases necessarily has a limited scope. Such decisions "are not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power."

*Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade*, 412 U.S. 800, 806, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973) (citation omitted). Findings of this nature "are set aside only if 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law' or if 'unsupported by substantial evidence.' (citations omitted)." *Coca-Cola Co. v. Atchison, Topeka & Santa Fe Railway Co.*, 608 F.2d 213, 218 (5th Cir. 1979). The record in this proceeding, its size and the nature of the testimony, offers a pointed and practical reminder of the wisdom that prompts this deference. The words of Justice Frankfurter are appropriately recalled:

The process of ratemaking is essentially empiric. The stuff of the process is fluid and changing—the resultant of factors that must be valued as well as weighed. Congress has therefore delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems.

*Board of Trade of Kansas City v. United States*, 314 U.S. 534, 546, 62 S.Ct. 366, 372, 86 L.Ed. 432 (1942).

■ With these restraints in mind, we address petitioners' challenges to the Commission's rate decision here. In its attack on this decision, the utility focuses on several asserted computational errors in the Commission's determination of fully allocated costs.[1] After consideration of petitioners' charges of error here, this court does not find the Commission's cost determinations to be arbitrary, unsupported by the evidence, or abusive of its power. The computations are derived from a reasoned exercise of agency judgment and expertise and merit this court's affirmance; further discussion would only muddy waters now sufficiently clear.

I. *The "Seven Percent Solution."*

Deference, however, must not become abdication of responsibility; in appropriate circumstances it must be constrained. In its routine and automatic allowance of a differential pricing additive to this proposed rate, the Commission has turned away from the reasoned decisionmaking that merits judicial respect.

The principle of differential pricing recognizes that, in order to insure to the railroads a reasonable overall rate of return, some traffic must bear charges above fully allocated costs since other traffic, because of the need to meet competition from other transportation modes, moves at rates below those costs. This general concept is not here challenged by petitioners. All parties apparently agree that the principle may serve a useful purpose in resurrecting the nation's railroads from anemic desuetude: if higher rate traffic did not partially subsidize traffic beset by competition, that latter rail service might disappear, leaving the former to bear ever-increasing system costs alone. Petitioners do strenuously object to the seemingly automatic application of a differential pricing additive to the rates they must pay. System and the United States in its appearance before this court argue that the Commission forfeited its shield of agency expertise by its automatic, unreasoned invocation of differential pricing in this specific case. We find this objection well taken.

In the final paragraphs of its opinion, the Commission discussed the differential pricing additive. Referring to earlier opinions (principally *San Antonio v. Burlington Northern, Inc.*, 361 I.C.C. 482 (1979) (*San Antonio III*)) in which rates exceeding fully allocated costs by seven percent were found reasonable, the Commission made this "finding": "[T]he $12.78 proposed rate is clearly within the 7 percent increment found to be reasonable in San Antonio III and *Flint Creek [Annual Volume Rates on Coal—Wyoming to Flint Creek, Arkansas*, 361 I.C.C. 533 (1979) (*Southwestern Power*)]. A similar finding is warranted here." 361 I.C.C. at 517. That the above was substantially the entire rationale for its decision is conceded by the Commission in its brief before this court: "[T]he agency was obligated, for the sake of consistency, to allow the same seven percent increment here or explain why this case justified another result. . . . Finding no basis on which to distinguish this case, the Commission concluded that a seven percent increment was appropriate." But consistency's sake, frequently commendable in administrative decisions, alone merits little deference in specific cases. And the foundation of that consistency is now showing serious cracks.

As noted in its opinion here, the Commission first accepted a differential pricing additive in the *San Antonio III* rate proceeding. In that decision the Commission considered the appropriateness of a proposed rate that exceeded fully allocated costs by seven percent. The Commission discussed in careful language the proper balance to be struck:

> The question is one of determining the extent to which some shippers should sub-

---

1. Petitioners complain particularly about the allowance in the rate of a factor representing a return on investment in locomotives that may be leased rather than bought; an alleged misal-location of the costs of certain new fixed plant investments; and inclusion of a return factor in constant costs.

sidize others in the interest of producing a financially viable rail system. *There is no simple formula for making that determination.* Before the Commission can impose a substantial burden on some shippers, the railroads must show more than revenue need on a system basis. The Commission must have additional data, including (1) specific identification of the traffic that must be subsidized by other traffic and the reason why rates cannot be increased on that traffic; (2) the extent to which the railroads provide service on unprofitable branch lines and the reason(s) why such service cannot be made profitable or abandoned; (3) identification of commodities other than coal which could also make substantial contributions to the railroads' system revenue needs; and (4) identification and quantification of excess capacity on a carrier's system.

*San Antonio III*, 361 I.C.C. at 495–96 (emphasis added).

But after admitting there existed "no simple formula" for resolving the question, the Commission proceeded to find one in the "seven percent solution." The guidelines so ably pronounced were to be applied when the Commission sought "to impose a *substantial* burden" (emphasis added) on the shippers—that is, it appears, a burden beyond a mere seven percent over fully allocated costs. An additive within the seven percent figure is apparently to receive no scrutiny at all.

The arbitrariness of that resolution has not escaped criticism within or without the Commission. Commissioner Gresham, dissenting in *San Antonio III*, stated: "I can find nothing magic in the 7-percent figure used by the majority in its final calculation." 361 I.C.C. at 498. Commissioner Christian, dissenting in the subsequent *Southwestern Power* case, expressed similar

reservations about this selection of a cutoff point:

> The "7-percent solution" is the height of arbitrary and capricious action. The statement that "[r]egulation of rates where differential pricing is required necessarily involves a policy judgment" should be the start of a principled, reasoned analysis. Instead, it is a pretext for picking the number "7" out of a hat.[2] 361 I.C.C. at 554.

To internal criticism of the *San Antonio III* formulation has been added judicial disapprobation. Subsequent to the application by the Commission of that decision to this case, the District of Columbia Circuit Court of Appeals remanded the *San Antonio III* proceeding and directed the agency "to explain more fully its reasons for selecting a particular increment, if any, above fully allocated costs." *San Antonio v. United States*, 631 F.2d 831, 853 (D.C. Cir. 1980). In language applicable to the Commission's decision here, that court illustrated the vacuity of the Commission's decisionmaking process in its *San Antonio III* proceeding.

> There is nothing in the record in the way of findings, evidence, or rationale to support the seven percent solution or any percentage solution. The Commission's general allusion to the need to consider the revenue requirements of the carriers and the economics of differential pricing is so broad as to be meaningless as a standard—this rationale could be put forth just as readily in an attempt to justify a 1%, 21% 45%, or even a 99% additive.

*Id.* at 852. And in *Celanese Chemical Co. v. United States*, 632 F.2d 568 (5th Cir. 1980), this court recently rejected a Commission rate determination for, among other reasons, its automatic and unreasoned application of a 19 percent differential pricing

---

2. Commissioner Christian again voiced her dissatisfaction with the seven percent solution in a concurring statement in this rate proceeding: "My only disagreement with the decision is with its use of a 7 percent increment above fully allocated costs as a measure of maximum reasonableness." 361 I.C.C. at 517.

Commissioners Gresham and Christian disagree with the seven percent solution in part because they feel it is an artificially *low* number against which to measure carriers' revenue needs. Indeed, in other proceedings, the carriers themselves have attacked the percentage figure *as being inadequate. This court does not* find the figure either arbitrarily low or high—merely arbitrary.

additive. Restating and refining the Commission's own *San Antonio III* criteria, the court ordered:

> On remand, the Commission should identify the traffic requiring subsidization, show why it needs the subsidy and quantify the needed subsidy. It should then identify the traffic which can contribute to the subsidy, and assess the reasonableness of the burden placed on this particular coal service in light of the overall size of the burden and the number and size of the shippers available to carry the burden.

*Id.* at 577. An identical remand order is appropriate here.

 In support of the challenged rate, however, the railroad and the Commission lawyers argue that their case is not properly classifiable as one invoking the seven percent solution: the rate approved by the Commission exceeded fully allocated costs by only 3.7 percent; such a slight additive, they urge, is clearly within the undefined (and perhaps indefinable) "zone of reasonableness" allowed such proposals. That shot is wide of the mark. A 3.7 percent additive, while unquestionably less substantial than a seven percent increase, is no less arbitrary and no more palatable as an exercise in reasoned decisionmaking. In its *San Antonio III* opinion the Commission listed the four factors for consideration before imposition of a "substantial" differential pricing burden. A "substantial burden" was thus implicitly defined as one in excess of seven percent; an additive of seven percent or less was, as here, routinely to be accepted without resort to the enumerated factors. It is this artificiality and arbitrariness that we now reject. We substitute no new magic number; we hold that factors like those listed by the Commission in *San Antonio III* and by this court in *Celanese* must be addressed whenever the Commission accepts. as just and reasonable a rate that includes a differential pricing additive.[3]

The railroads and the Commission argue that disapproval of this additive connotes rejection of the entire concept of differential pricing. We reject that characterization of our action. As recognized by this court in *Celanese*, 632 F.2d at 577 n.18, "[t]he revenue adequacy provisions of the 4–R Act [Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 10704(a)(2)] may be read to authorize some differential pricing."[4] We do not express reservations here about the Commission's power to accept a differential pricing additive, after due consideration and elaboration of the pertinent factors; we simply require that this consideration be given.

In this proceeding, as in *San Antonio III*, the Commission acknowledged some "general reservations concerning the extent to which differential pricing should be allowed on captive coal traffic." 361 I.C.C. at 517. In reaching its subsequent decision, how-

---

**3.** We do not here discuss the possibility of a de minimis burden, one not warranting the time or expense of such an administrative challenge, beyond remarking that 3.7 percent is not such a figure.

**4.** 49 U.S.C. § 10704(a)(2) states:

(2) The Commission shall maintain standards and procedures for establishing revenue levels for rail carriers providing transportation subject to its jurisdiction under that subchapter [49 U.S.C.S. §§ 10501 et seq.] that are adequate, under honest, economical, and efficient management, to cover total operating expenses, including depreciation and obsolescence, plus a reasonable and economic profit or return (or both) on capital employed in the business. The Commission shall make an adequate and continuing effort to assist those carriers in attaining revenue levels prescribed under this paragraph. However, a rate, classification, rule, or practice of a rail carrier may be maintained at a particular level to protect the traffic of another carrier or mode of transportation only if the Commission finds that the rate or classification, or rule or practice related to it, reduces or would reduce the going concern value of the carrier charging the rate. Revenue levels established under this paragraph should—

(A) provide a flow of net income plus depreciation adequate to support prudent capital outlays, assure the repayment of a reasonable level of debt, permit the raising of needed equity capital, and cover the effects of inflation; and

(B) attract and retain capital in amounts adequate to provide a sound transportation system in the United States.

ever, no apparent attention was paid to the plight of the "captive shipper" beyond that expression of concern. The Commission accepted what it viewed as "the explicit mandate of the 4R Act to give deference to carrier revenue needs in rate proceedings." *Id.* The statute, however, as we read it, does not command absolute obeisance to railroad revenue needs, to the exclusion of proper consideration of all other factors. As the District of Columbia Circuit Court recognizes in the *San Antonio III* opinion, "the 4R Act evinces a congressional policy to 'balance the needs of carriers, shippers, and the public.' (citation omitted)." 631 F.2d at 852. *See also* Staggers Rail Act of 1980, Pub.L.No. 96–448 § 3(4).

It is undeniably in the public interest "to provide for the restoration, maintenance, and improvement of the physical facilities and financial stability of the rail system of the United States." *Id.* § 3. But in these days of shortages in national oil and gas reserves, the public interest likewise is served by the promotion of use of other sources of energy—such as the coal-fired electrical generating facilities to be operated by AP&L. We have recently acknowledged that it is "obvious that the establishing of railroad rates for the transportation of coal has a great impact on our national energy policy." *Celanese*, 632 F.2d at 578. This decision of the Commission evidences no consideration of the impact of a differential pricing additive on the utility's effort efficiently and economically to provide coal-fired electric service. A 3.7 percent additive to fuel transportation rates may have no significant impact on the cost or quality of the resulting electrical service; that evaluation is not for this court in the first instance. The Commission can more appropriately examine that question; it is our order that it do so.

## II. *Alternating Rate.*

Petitioners also challenge the Commission's failure to disapprove the alternating rate of $20.42 per ton set by the railroads. The alternating, or "fall back," rate applies only when the shipper takes delivery on less than the agreed minimum annual volume of coal—here three million tons. In its brief before this court the utility indicates that its complaint to the Commission, and its brief before that agency, adequately attacked the reasonableness of the railroads' proposal. Petitioners express incredulity that the Commission did not accede to their request and question the reasonableness of this rate. The Commission's order, supported by this court's reading of the record, adequately disposes of this objection:

> We agree with the initial decision [of the ALJ] that the alternating rate was not seriously challenged in this proceeding. Complainants introduced no probative evidence concerning the reasonableness of this rate, other than the comparison of the differential in a similar BN–MOP [Burlington Northern-Missouri Pacific] rate. Moreover, in the evidentiary presentation the AP&L president stated that "We do not suggest any modification" of the $20.42 rate. In light of this statement and the lack of any other comprehensive analysis regarding the alternating rate, we cannot find error in the initial decision's failure to consider the alternating rate. 361 I.C.C. at 510–11.

Petitioners' earlier inattention to this issue is now of little moment; in light of our remand order, the Commission must again consider the reasonableness of the proposed rates. In its statement on the alternating rate the Commission indicated a willingness at that time to listen if petitioners had anything to say:

> We expect that these parties will negotiate any differences concerning the alternating rate prior to the commencement of this movement in late 1979 [a lost hope indeed]. If, however, such negotiations prove fruitless complainants [the utility] will be given the opportunity to come forward with additional evidence concerning the reasonableness of the alternative rate. *Id.* at 511.

Nothing before this court suggests that the opportunity will be denied petitioners on remand.

III. *Conclusion.*

With no explication of supporting reasons beyond a reference to disputed and dubious authority and no apparent consideration for the important public interest in the development of alternative fuels to oil and gas, the Commission approved a rate in excess of fully allocated costs. That decision cannot stand. Finding merit in System's complaint about the Commission's use of the differential pricing additive, we remand this case to the Commission for reconsideration and elaboration of the reasons for allowance of an additive in light of this opinion.

REMANDED